**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| |
|---|
| IN RE K12, INC. SECURITIES LITIGATION |

Case No. 1:14-cv-00108-AJT-JFA

**JURY TRIAL DEMANDED**

**ECF CASE**

<u>**AMENDED CLASS ACTION COMPLAINT**</u>

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................. 2

II.   JURISDICTION AND VENUE ......................................................... 7

III.  THE PARTIES.................................................................................... 8

     A.    Lead Plaintiff ...................................................................... 8

     B.    Defendants .......................................................................... 8

IV.  DEFENDANTS' FRAUDULENT CONDUCT ................................. 10

     A.    Student Enrollment At K12's Managed
           Public Schools Is Critical To The Company's Success ....................... 10

     B.    Chairman Davis Has Now Admitted That K12 Suffered A Sharp
           Decline In Student Applications In Early 2013, Largely Because
           K12's "Own Promotional Program Started Later Than It Should Have"............. 13

     C.    Chairman Davis Has Now Admitted That K12's Enrollment
           "Process Broke Down" During The Class Period.................................. 17

          1.    K12's "Late" Promotional Campaign Caused
                 A Bottle-Neck In The Company's Enrollment
                 Center That Prevented K12 From Converting
                 Student Applications Into Enrollments...................................... 18

          2.    Chairman Davis Admitted That K12 Failed To Consider
                 Compliance Requirements That Prevented The Company
                 From Converting Student Applications Into Enrollments ....................... 23

     D.    Defendant Rhyu Affirmed Analysts' Consensus Estimates
           On August 29, 2013, Driving Up K12's Stock Price,
           Only To Reverse Course Weeks Later.................................................. 28

     E.    Defendant Packard Reaped Millions Of Dollars From Inside Stock Sales ......... 30

     F.    The Truth Is Revealed.......................................................... 37

V.   ADDITIONAL SCIENTER ALLEGATIONS.................................. 41

VI.  MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS..... 51

     A.    The February 5, 2013 Conference Call................................ 51

B.      The March 11, 2013 Industry Conference .............................................................. 54

C.      The May 3, 2013 Conference Call........................................................................ 57

D.      The 2013 Form 10-K ........................................................................................... 64

E.      The August 29, 2013 Conference Call................................................................. 67

VII.    LOSS CAUSATION............................................................................................. 70

VIII.   THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR........................... 72

IX.     THE PRESUMPTION OF RELIANCE ................................................................. 73

X.      CLASS ACTION ALLEGATIONS ....................................................................... 74

XI.     CAUSES OF ACTION......................................................................................... 76

XII.    PRAYER FOR RELIEF ........................................................................................ 82

XIII.   JURY DEMAND.................................................................................................. 83

1.      The Oklahoma Firefighters Pension & Retirement System ("Oklahoma Firefighters" or "Lead Plaintiff"), by its undersigned counsel, hereby brings this action on behalf of itself and all persons or entities who purchased or otherwise acquired the common stock of K12, Inc. ("K12" or the "Company") from February 5, 2013 through October 8, 2013, inclusive (the "Class Period"), and were damaged thereby.   Excluded from the Class are Defendants (as set forth herein), present or former executive officers of K12, and their immediate family members (as defined in 17 C.F.R. § 229.404, Instructions (1)(a)(iii) and (1)(b)(ii)).   As explained further below, Lead Plaintiff seeks to recover damages caused by Defendants' violations of Sections 10(b), 20(a), and 20A of the Securities Exchange Act of 1934 (the "Exchange Act") and the U. S. Securities and Exchange Commission (the "SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5 ("Rule 10b-5") promulgated thereunder.

2.      Lead Plaintiff alleges the following based upon personal knowledge as to itself and its own acts and upon information and belief as to all other matters.   Lead Plaintiff's information and belief is based on, among other things, the independent investigation of its counsel, Bernstein Litowitz Berger & Grossmann LLP.   This investigation included, but was not limited to, a review and analysis of: (i) K12's public filings with the SEC; (ii) research reports by securities and financial analysts; (iii) transcripts of K12's earnings conference calls and industry conferences; (iv) publicly available presentations by K12; (v) K12's press releases; (vi) news and media reports concerning K12 and other facts related to this action; (vii) data reflecting the pricing of K12 common stock; (viii) consultations with relevant experts; (ix) information obtained from former K12 employees and other knowledgeable individuals throughout the course of counsel's investigation; and (x) other publicly available material and data, including as identified herein.   Counsel's investigation into the factual allegations

contained herein is continuing, and many of the relevant facts are known only by the Defendants or are exclusively within their custody or control.  Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for further investigation or discovery.

## I.    INTRODUCTION

3.      K12 is a for-profit education company that operates online public schools for students in kindergarten through twelfth grade, called "Managed Public Schools."  K12's core Managed Public School segment is the primary source of the Company's revenue, and supposedly served as an engine of unlimited growth during the Class Period.

4.      K12 has a history of "tremendous" reported growth.  The Company's growth depends on K12's ability to: (1) execute on promotional plans that generate a large number of "leads" – students who are interested in K12's Managed Public Schools; and (2) efficiently "convert" those students' K12 applications into actual enrollments, in compliance with legal requirements that vary significantly by state.

5.      During the Class Period, to perpetuate the market's perception that K12 would continue to grow, the Company's senior executives repeatedly claimed that K12 had a focused marketing strategy, that K12's core fundamentals "remain[ed] strong," and that the Company had "increasingly robust" compliance and other measures in place to drive strong growth in enrollments.  For example, Defendants claimed that:

- K12 had "a conscious strategy to try to focus on marketing to states that had a higher funding rate," and that the Company was "clearly focused on where the dollars are." – Defendant Murray (February 5, 2013)

- K12's growth would be achieved due to the Company's "above the bar" and "very serious[]" approach to compliance requirements.  – Defendant Packard (March 11, 2013)

- "[T]he underlying fundamentals in the core business remain strong, specifically enrollment."  – Defendant Hawks (May 3, 2013)

- K12's "management systems and processes [are] designed to ensure that schools . . . are in compliance with all applicable requirements," and "our processes have grown increasingly robust."  – Form 10-K (August 29, 2013)

6.     In addition, Defendants reassured investors during the Class Period that K12 was "comfortable" with analysts' consensus estimates.  On August 29, 2013, K12's Chief Financial Officer ("CFO"), Defendant James Rhyu – who joined K12 on July 1, 2013 – endorsed Wall Street's bullish consensus estimates for fiscal 2014 revenue of $986.8 million, net income of $36.2 million, and earnings per share ("EPS") of $0.95.[1]  This affirmation furthered the investing public's perception that K12's enrollment processes and tools "remain[ed] strong," had grown "increasingly robust," and thus the Company was poised for explosive growth.

7.     Defendants' public statements, including those discussed above, caused K12's stock price to increase by ***more than 100%*** during the eight-month Class Period, more than doubling from $18.53 on February 4, 2013 to $37.85 on September 10, 2013 (the Class Period high).

8.     Indeed, based on Defendants' falsely positive statements to investors, analysts recommended that investors purchase K12 stock.  For instance, on February 5, 2013, the first day of the Class Period, Credit Suisse increased its earnings estimates based on Defendants' positive statements, reporting that "Execution [Was] In Focus" at K12.  Similarly, BMO Capital Markets highlighted Defendant Rhyu's endorsement of consensus estimates on August 29, 2013 and, in turn, raised its "fiscal 2014 EPS estimate to $0.95," *i.e.*, the exact EPS target Rhyu had

---

[1] K12 operates on a fiscal year that ends June 30, with the first fiscal quarter ending September 30, the second fiscal quarter ended December 31, and the third fiscal quarter ending March 31.

3

endorsed.  And, while K12's stock price was inflated, K12's Founder and Chief Executive Officer ("CEO"), Defendant Ronald Packard, sold nearly two hundred thousand of his personally held K12's shares for gross proceeds of more than $6.3 million.

9.      However, at all relevant times during the Class Period, Defendants knew that their statements about "strong" performance – "specifically enrollment" – in the Managed Public Schools segment were a fiction.  In reality, Defendants knew that K12 was suffering from a significant decline in the number of applications it received in early 2013.  In fact, the company has admitted that applications were down 9% from March to June 2013, and, according to a confidential witness, that negative trend began in January 2013.  Defendants also knew that, during the Class Period, the Company's enrollment center was what one former Admissions Liaison who worked at K12 headquarters called a "***mad mess***."[2]  In addition Defendants were aware, before the end of the Class Period, that K12 was not converting the applications that it did receive into actual enrollments at the target rate.  Defendants do not deny this.

10.      In fact, on October 8, 2013, the last day of the Class Period, and after the close of trading, K12 disclosed to the market for the very first time that there was a significant enrollment shortfall in K12's Managed Public Schools.  Specifically, K12 disclosed that, "Managed Public School enrollments fell short of internal expectations due to several factors" including the "Company's inability to convert the increased volume of student applications into enrollments at a level achieved during previous years due to performance in its enrollment centers."

---

[2] All emphasis in this Complaint is added unless otherwise indicated.

11.     As a direct result of this shocking news, the Class Period inflation in K12's stock price was entirely wiped out.  On the very next trading day, October 9, 2013, K12's stock price fell by more than 38% on record trading volume, causing hundreds of millions of dollars in lost shareholder value.

12.     K12's October 8, 2013 revelation stood in stark contrast to Defendants' repeated, reassuring statements during the Class Period, including Defendant Rhyu's statements to investors less than six weeks earlier, on August 29, 2013, affirming comfort with analyst expectations.  Analysts immediately called attention to this sharp discrepancy.  For example, on October 10, 2013, Wells Fargo analysts wrote that "management will likely be asked in particular to explain how the end enrollment results could ***differ so materially*** from expectations it articulated on a[n August 29, 2013] investor call."  Similarly, Morgan Stanley analysts wrote on October 9, 2013 that, "on August 29 [K12 management] highlighted its comfort with consensus estimates, which at the time were $987M [in] rev[enues] . . . [but] [y]esterday's preannouncement is ***well below these figures***."

13.     Indeed, after the Class Period, K12's Executive Chairman, Defendant Nathaniel Davis, and K12's Chief Operating Officer ("COO"), Defendant Timothy Murray, made a series of damning admissions about the misconduct alleged herein that essentially conceded that they and the other Officer Defendants (defined below) made knowingly or, at minimum, very reckless false statements during the Class Period.

14.     To start, Defendant Davis admitted that K12's "own promotional plan started later than it should have," and that this delay caused a material, 9% decline in the number of Managed Public School applications that K12 received beginning in early 2013.

5

15.     In addition, Defendants Davis and Murray admitted to a breakdown in the Company's enrollment process – and "school-by-school planning tools" – such that K12 was not able to effectively convert applications into enrollments during the Class Period.  In that regard, Davis admitted that, because K12's belated promotional efforts were generating such a low number of student applications in early 2013, the Company changed its marketing strategy in mid-2013, but that did more harm than good.

16.     Specifically, Davis admitted that K12's last-minute change in promotional plan created a glut of applications late in the enrollment season, which pushed K12's enrollment platform to the "tipping point." The Company was "unable to convert available applications, given the enrollment windows."  As Davis explained, "we generated demand too late and the spike in demand late in the season *hurt us*."  In fact, Defendants have acknowledged a spike in applications at the most inopportune time – August 2013 – and admitted that their poorly staffed enrollment center was "overwhelmed" because the "planning and reporting tools" that managed K12's enrollment process "simply weren't robust enough."

17.     As a result, as Defendant Murray also admitted, "the process broke down . . . in converting those applications to enrollments" because K12 "didn't have the correct staffing model in place at [its] enrollment centers to handle the timing and the volume of applications." Davis also admitted that there were "new compliance requirements that we did not factor in appropriately into our capacity planning model for the enrollment centers," which also hurt K12's ability to convert applications to Managed Public School enrollments.

18.     Indeed, on October 10, 2013, Davis even revealed that K12 was aware that there were "some issues *early*" in the enrollment season.  Yet, instead of disclosing those issues, K12 concealed them from investors with blind hope that K12's systemic problems would all, as

described by Defendant Davis after the Class Period, be corrected somehow "*in the September timeframe*."  As Davis acknowledged, "*obviously that didn't happen*."

19.     Ultimately, K12 was forced to admit that, but for serious, previously undisclosed problems at the Company, K12 "would have enrolled approximately 11,000 more students in this fiscal [2014] year."   As discussed above, when the Company announced the financial impact of this enrollment shortfall on the last day of the Class Period, K12's stock price fell by more than 38% on its highest-ever trading volume, causing significant harm to Lead Plaintiff and others members of the Class.

## II.    JURISDICTION AND VENUE

20.     This Complaint asserts claims under Sections 10(b), 20(a), and 20A of the Exchange Act, 15 U.S.C. §§ 78j(b), 78t(a), and 78t-1, and the rules and regulations promulgated thereunder, including Rule 10b-5.

21.     This Court has jurisdiction over the subject matter of this action under Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1331, because this is a civil action arising under the laws of the United States.

22.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b), (c), and (d).  Many of the acts and transactions that constitute the alleged violations of law, including the dissemination to the public of untrue statements of material fact, occurred in this District where the Company maintains its corporate headquarters.

23.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mail, interstate telephone communications, and the facilities of national securities exchanges.

### III.    THE PARTIES

#### A.    <u>Lead Plaintiff</u>

24.    Court-appointed Lead Plaintiff, the Oklahoma Firefighters, is the public pension system for firefighters in the state of Oklahoma, created in 1981, and currently holds more than $2 billion in net assets for the benefit of more than 23,000 members and beneficiaries.  As set forth in the certification attached hereto as Exhibit A, the Oklahoma Firefighters purchased K12 common stock during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

#### B.    <u>Defendants</u>

25.    Defendant K12 is a technology-based education company incorporated in Delaware, with corporate headquarters located at 2300 Corporate Park Drive, Herndon, Virginia.  During the Class Period, and at all times relevant hereto, K12's common stock traded on the New York Stock Exchange ("NYSE") under the ticker symbol LRN.

26.    Defendant Ronald J. Packard ("Packard") was at all relevant times K12's Founder, CEO, and a member of the Company's Board of Directors.  Defendant Packard has been a Director of K12 since he founded the Company in 2000.  During the Class Period, Packard reviewed, approved, and signed K12's Form 10-K annual report filed with the SEC on August 29, 2013 for the fiscal year ended June 30, 2013 (the "2013 Form 10-K"), which contained materially false and misleading statements and failed to disclose material facts, as detailed herein.  Packard also participated in earnings conference calls and industry conferences with investors and securities analysts during which he made additional materially false and misleading statements and failed to disclose material facts.  A K12 press release issued shortly

after the Class Period, on January 7, 2014, unexpectedly announced that Defendant Packard resigned from K12 on December 31, 2013 after more than a decade at the helm.

27.     Defendant Nathaniel A. Davis ("Davis") was at all relevant times K12's Executive Chairman.  Defendant Davis became K12's Executive Chairman in January 2013 and has served as a member of K12's Board of Directors since July 2009.  During the Class Period, Davis reviewed, approved, and signed K12's 2013 Form 10-K, which contained materially false and misleading statements and omissions, as detailed herein.  Davis also participated in earnings conference calls with investors and securities analysts during which Davis made additional materially false and misleading statements and failed to disclose material facts.

28.     Defendant Harry T. Hawks ("Hawks") joined K12 in May 2010 and served as the Company's Executive Vice President and CFO until his resignation effective May 31, 2013. Following his resignation, Defendant Hawks agreed to serve as a K12 consultant for a period of three months to help transition his role to a new CFO.  During the Class Period until May 31, 2013, Hawks participated in earnings conference calls with securities analysts during which Hawks made materially false and misleading statements and failed to disclose material facts.

29.     Defendant James J. Rhyu ("Rhyu") joined K12 as of June 2013 as the Company's Executive Vice President and CFO, following Defendant Hawk's resignation. During the Class Period, Defendant Rhyu reviewed, approved, and signed K12's 2013 Form 10-K, which contained materially false and misleading statements and omissions, as detailed herein.  Rhyu also participated in an earnings conference call with investors and securities analysts during which Rhyu made additional materially false and misleading statements and failed to disclose material facts.

30.     Defendant Timothy L. Murray ("Murray") was at all relevant times K12's President and COO.  Defendant Murray became K12's President and COO in April 2012. During the Class Period, Murray reviewed and approved K12's 2013 Form 10-K, which contained false and misleading statements and omissions, as detailed herein.  Murray also participated in earnings conference calls with investors and securities analysts during which Murray made materially false and misleading statements and failed to disclose material facts.

31.     Defendants Packard, Davis, Hawks, Rhyu, and Murray are collectively referred to herein as the "Officer Defendants," and collectively with K12 as "Defendants."

32.     The Officer Defendants, because of their high-ranking positions and direct involvement in the everyday business of the Company, directly participated in the management of K12's operations, including its reporting functions, had the ability to, and did control K12's conduct, and were privy to confidential information concerning K12 and its business, operations and financial statements, as alleged herein.  The Officer Defendants were directly involved in controlling the content of, and in drafting, reviewing, publishing and/or disseminating the false and misleading statements and information alleged herein, were aware of, or recklessly disregarded, that the false and misleading statements and omissions were being issued, and approved, ratified, or made these misstatements and omissions in violation of the federal securities laws.

## IV.   DEFENDANTS' FRAUDULENT CONDUCT

### A.   Student Enrollment At K12's Managed Public Schools Is Critical To The Company's Success

33.     K12 operates through three business segments:  (i) Managed Public Schools (turn-key management services provided to public schools); (ii) Institutional Sales (educational

products and services provided to school districts, public schools, and other educational institutions that K12 does not manage); and (iii) the International and Private Pay Business (private schools for which K12 charges student tuition and makes direct consumer sales).  The Company's core operations and revenues are heavily concentrated in the Managed Public Schools segment, at issue here.[3]

34.     K12 defines "Managed Public Schools" as "[v]irtual and blended public schools [*i.e.*, programs in which brick and mortar school structure and face-to-face classroom methods are combined with online learning] generally under long-term turn-key management contracts" with the Company.

35.     Student enrollments at K12's Managed Public Schools are the primary source of the Company's revenue.  K12's 2013 Form 10-K states that contracts with Managed Public Schools accounted for approximately *86%* of revenues in fiscal year 2013, and *84%* of revenues in fiscal year 2012.  The 2013 Form 10-K also acknowledges that the Company's revenues are concentrated in the Managed Public Schools segment, and that Managed Public Schools "will continue to represent the majority of [K12's] total revenues "for the next 12 to 24 months." Enrollment at, and revenue derived from, K12's Managed Public Schools are thus the key metrics in K12's financial reports, as the growth rate of student enrollments at K12's Managed Public Schools generally track the Company's annual rate of revenue growth.  In turn, investors

---

[3] In the 2012-13 school year (September 2012 through May 2013), K12 provided turn-key management services to Managed Public Schools in 32 states – Alaska, Arizona, Arkansas, California, Colorado, Florida, Georgia, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Louisiana, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, New Mexico, Ohio, Oklahoma, Oregon, Pennsylvania, South Carolina, Tennessee, Texas, Utah, Virginia, Washington, Wisconsin, and Wyoming – and the District of Columbia.  In the 2013-14 school year (September 2013 through May 2014), K12 added Delaware to the list.

and market analysts closely follow the Company's public statements about enrollment at K12's Managed Public Schools.

36.     All of K12's Managed Public Schools receive public funding on a "per student" basis.  According to an October 2013 report issued by the International Association for K-12 Online Learning ("iNACOL"), the current estimated U.S. average expenditures for a fully online school are $6,400 per student, and the current estimated U.S. average expenditures for "blended" learning are estimated at $8,900 per student.  K12's 2013 Form 10-K explains that, for purposes of counting the number of students enrolled at Managed Public Schools, K12 defines "an enrollment as a student using [K12] curriculum" and even "count[s] each half-day kindergarten student as an enrollment."  According to the Company's 2014 Academic Report issued on February 7, 2014, in the 2012-2013 school year (running from September 2012 through May 2013), K12 had contracts with some 50 Managed Public Schools that enrolled approximately 110,000 students.

37.     Given the direct relationship between student enrollment at K12's Managed Public Schools and the Company's revenues, according to K12's SEC filings, the Company "*continually* evaluate[s] [its] enrollment levels by state, by school and by grade," and "track[s] new student enrollments . . . throughout the year."  K12 also represents that it "*continually* evaluate[s] [its] trends in revenues by monitoring the number of student enrollments in total, by state, by school and by grade, assessing the impact of changes in school funding levels and the pricing of [its] curriculum and educational services."

38.     Pursuant to the terms of its Managed Public School contracts, K12's fees are based on the number of full-time students or full-time equivalent students enrolled.  Indeed, the Company's Class Period SEC filings state that, "in certain managed school contracts, revenue is

12

determined *directly* by per [student] enrollment funding." The "direct" relationship between the Company's revenues and enrollment at Managed Public Schools makes maintaining high student enrollment growth at Managed Public Schools critical to K12's financial success.

39.    Based on the forgoing and other facts, before the Class Period, on December 12, 2011, *The New York Times* published an article that heavily criticized the Company for using predatory enrollment tactics to enroll students in the Company's Managed Public Schools that were driven in part by the fact that "[s]ome [K12] workers, called 'enrollment pals,' are paid bonuses based on the number of students they sign up," and that even "Packard's annual bonus is also partly tied to enrollment." In response to the negative media attention, K12 brought in at least three new executives to oversee the Company's operations. First, K12 hired Defendant Murray as COO in April 2012. Second, K12 elevated Defendant Davis to Executive Chairman in January 2013. Third, K12 hired a new Vice President of Enrollment, Todd Goldthwaite ("Goldthwaite"), in or around early 2013, who reported to Murray.

40.    Notably, in a May 6, 2012 *Washington Post* article discussing Murray's appointment as COO five months after *The New York Times* article, Murray was described as having a "niche for turning around companies." When asked what his "secret" was, Murray responded that, "from a process perspective, I understand what business process is required to deliver performance to the customers' expectations. Then you sweat all the details to make sure you operate that process effectively."

**B.    Chairman Davis Has Now Admitted That K12 Suffered A Sharp Decline In Student Applications In Early 2013, Largely Because K12's "Own Promotional Program Started Later Than It Should Have"**

41.    As described by Defendant Murray, K12's enrollment process has "three stages – lead, application and then enrollment." The "lead" stage is primarily driven by K12's

13

promotional program, discussed below.  Once a lead is generated, a K12 enrollment consultant contacts the prospective student's family.  If a family is interested in applying to one of K12's Managed Public Schools, the application process commences.

42.     On October 10, 2013, the Company admitted that, "[d]uring March to June of 2013, [K12] received 9% fewer applications than we did during the timeframe one year earlier in 2012."  In fact, as described by CW1 (an Enrollment Manager at K12 headquarters from 2009 through at least June 2013 who reported to K12's Senior Director of Enrollment), K12 saw a trend in declining student application numbers that started in January 2013 and continued until CW1 left the Company in June 2013.[4]

43.     This decline in student applications was a red flag to K12's senior management that the Company's growth trajectory was in trouble, particularly because this drop was a sharp divergence from K12's history of "tremendous growth," as described by Defendant Packard in mid-2012 when naming Defendant Murray as K12's COO.  Despite the decline in applications in early 2013, on March 11, 2013, Defendant Packard falsely assured the investing public that K12 did not have a single growth impediment in sight, stating:  "One of the great things about K12, and at its heart, K12 is a growth company.  And it's rare, I think, you see a growth company that has ***really no asymptote in sight***."  An asymptote is a straight line that a curve, such as a growth curve, approaches as it flattens out, as shown below.

---

[4] At Appendix A, Lead Plaintiff provides the tenure, position, and job description of the former employees cited throughout this Complaint as CWs.



44.     As detailed herein, despite Packard's March 11, 2013 statements, there were numerous impediments in early 2013 that were causing a visible flattening of new enrollment growth at K12's Managed Public Schools, and, ultimately, disappointing enrollment numbers at the end of the Class Period.

45.     Consistent with CW1's statement that there was a negative trend in student applications that started in January 2013, numerous other K12 employees who worked in the Company's enrollment center were also aware of this negative trend as it was occurring.  For example, CW2 (a K12 Enrollment Consultant at Company headquarters from June 2010 until November 2013) stated that there was a contemporaneous decline in the number of student applications by no later than the end of April/early May 2013.  Likewise, CW4 (a K12 State Enrollment Consultant from April 2012 through June 2013) also observed that the volume of applications was lower in the spring of 2013 than it was in the spring of 2012.

46.     As admitted by Defendant Davis on October 10, 2013, the drop in applications was primarily caused by the fact that K12's "own promotional program started later than it should have."   The late start to K12's promotional program is further detailed by CW3 (a

15

Director of Social Media Marketing at K12's headquarters for seven years until November 2013) who stated that, in addition to a belated start, K12's executive management also decided to change the Company's marketing approach altogether.   CW3 stated that, instead of performing more targeted marketing efforts in states with the largest profit opportunities, K12 belatedly embarked on a new, national marketing campaign.   These new – more national – promotional efforts attracted many families who were not even qualified to apply to one of K12's Managed Public Schools.

47.     Defendants have admitted that they were aware that K12's belated and less targeted promotional efforts did not generate a high volume of leads and applications for the 2013-2014 school year.   Specifically, on November 7, 2013, Defendant Murray stated that:

> [O]n the demand-generation side, we started the enrollment season working to increase the efficiency of our marketing spend which meant increasing our mix of digital media as a way to balance growth and financial performance.   While initial results were encouraging, ***this shift didn't produce the volume of leads and applications we had anticipated***.   ***We then pivoted our investment*** to increase television advertising which generated strong demand. . . . too late and ***the spike in demand late in the season hurt us***.

48.     K12's need to shift its marketing strategy was an indication that there were significant problems at K12.   Indeed, K12's belated promotional program translated into an incredibly weak start to the 2013-2014 enrollment season – including a 9% decline in student applications between March and June 2013 – and, ultimately, a significant enrollment shortfall at the end of the Class Period.

49.     However, during the Class Period, Defendants touted their marketing efforts and their ability to drive increased enrollment growth.   For example, on February 5, 2013, Defendant Murray told investors that K12 had "a conscious strategy to try to focus on

marketing to states that had a higher funding rate" and that the Company was "clearly focused on where the dollars are."  Similarly, on May 3, 2013, Murray stated that, "our marketing and enrollment performance . . . [have been] [a]ided by the implementation of further SCO [supply chain operations] improvements, and more robust display advertising, auditing, and attribution analytics to strengthen our market science, and improve efficiency and yield."  Murray also described such actions as "indicative of our efforts to drive greater operational excellence in our marketing efforts."  These assertions were materially false and misleading.

      **C.**    **Chairman Davis Has Now Admitted That K12's
Enrollment "Process Broke Down" During The Class Period**

50.    Once an application is submitted by a prospective K12 student, K12 enrollment consultants and other admissions liaisons are supposed to promptly contact that student (or the student's family) in order to try to convert the application into an actual enrollment.  As Defendant Murray explained on the November 7, 2013 conference call, "where the process broke down was in converting those applications to enrollments" for the 2013-2014 school year.

51.    The enrollment "process broke down" because, during the Class Period, K12 made significant undisclosed changes to its enrollment centers and the resources that the Company devoted to Managed Public School enrollment.  Specifically, the Officer Defendants: (i) reorganized the K12 enrollment center staffing model; (ii) significantly reduced the incentives that K12 paid its enrollment staff; (iii) instituted an implied requirement that enrollment staff work weekends without any overtime pay; and (iv) increased the number of states for which each employee in the enrollment center was responsible, causing compliance and documentation deficiencies.  As detailed below, all of these undisclosed changes prevented the Company from  converting student applications into student enrollments for the 2013-2014

17

school year and, as Davis has since stated, the "net impact of the lower conversion rate [on K12's fiscal 2014 revenues] was significant."

> **1.      K12's "Late" Promotional Campaign Caused A Bottle-Neck In The Company's Enrollment Center That Prevented K12 From Converting Student Applications Into Enrollments**

52.     As explained by Defendant Davis, the conversion "process takes an average of *30 days* to complete."   But K12's delayed promotional efforts caused a bottle-neck in the Company's enrollment center, with an excessive number of applications that needed to be converted to enrollments in mid- to late summer 2013, when it was too late to do so before the start of the school year in September 2013.  As Davis admitted on October 10, 2013, because K12's promotional program "started later than it should have, [it] drove more leads and applications later in the summer instead of early in the summer."  Davis explained that "this shortened the time that [K12] had to help parents with all of the documentation required to complete the enrollment."  Davis further stated that K12 "didn't have the correct staffing model in place at our enrollment centers to handle the timing and volume of applications."  Moreover, "in the face of that trend," Davis explained that K12 "did not balance [its] resources appropriately."

53.     K12's staffing model and other changes at the Company's enrollment center were made by, and the responsibility of, the Officer Defendants.  When asked the following question during K12's October 10, 2013 call about what went wrong at K12's enrollment center during the Class Period, Davis took full responsibility:

> Analyst:        [G]iven that there was some transition at the top, with Nate [Davis] coming in – can you just talk about that transition, and to what extent that played a role?  Or what else played a role in the issues happening this year versus other years?

18

Davis: We did not have the right model.  And, yes, there were changes at the top, so I take full responsibility.  This is not on anybody else; it's on my leadership.

54.     Indeed, at the Officer Defendants' direction, Goldthwaite – who became K12's Vice President of Enrollment in or around early 2013 – implemented numerous staffing and resource changes at the Company's enrollment center that had negative effects on K12's ability to convert student applications into enrollments for the 2013-2014 school year.  Numerous CWs who worked at the K12 enrollment center at Company headquarters have stated that Goldthwaite's changes to K12's enrollment center during the Class Period had a dramatic effect on their ability to process applications and convert them into official Managed Public School enrollments.

55.     As described by CW4, Goldthwaite changed "everything" at K12 in 2013.  CW5 (a State Enrollment Consultant and Personal Admissions Liaison at K12 headquarters from August 2012 to October 2013) further reported that the entire K12 enrollment center changed before the first quarter of 2013 [*i.e.*, July, August and September 2013], which was K12's busiest time of year.  Indeed, Goldthwaite's changes to K12's enrollment center during the Class Period were sweeping.

56.     As detailed by myriad enrollment specialists who worked at K12's enrollment center during the Class Period, families who were originally interested in K12's services were routinely made to wait for weeks before a follow-up call was made to complete their enrollments – and sometimes K12 never followed through at all.  Critically, by the time school starts in September, unless families are timely enrolled in a K12 Managed Public School, those who initially express interest in K12's pursue and secure other educational options in order to ensure that their children can go to school.  This in fact occurred during the Class Period.

57.     For example, CW1 (an Enrollment Manager responsible for a team of 96 Enrollment Consultants at K12's headquarters) reported that K12 changed the organization of the enrollment center in 2013 such that different groups of staff handled different stages of the process, making it so that days or weeks passed between the time a family submitted an application and K12 contacted the family to commence the enrollment process.   CW1 noted that, prior to 2013, K12 employees typically handled an applicant through the entire enrollment process, which was smoother – because it allowed for consistent communications between enrollment consultants and a given family – and led to higher conversion rates.

58.     Likewise, CW6 (an Enrollment Consultant at K12 headquarters between 2011 and April 2014) reported that there was regularly 30 or 60 days between the time an applicant called K12's enrollment center and the time an enrollment consultant contacted the applicant because of disjointed workflow procedures and insufficient staff to handle all of the enrollment conversions in 2013 – a change from prior years.

59.     Moreover, K12's enrollment center lacked the infrastructure necessary to handle the demands of the enrollment process.   As described by CW7, an Admissions Counselor in K12's headquarters from April 2013 through October 2013, applicants' families were lucky if K12 ever contacted them at all.   CW7 recalled a significant interruption in the Company's response time to applicants due to a number of phone and fax problems that prevented K12 from converting applications to enrollments in time for school deadlines.   CW7 stated that there was a "serious mechanical issue" that resulted in many missed conversion opportunities – and that the call center simply could not handle the volume.   Further, when the fax machines were working, CW7 learned from her Enrollment Supervisor, Nick Brisky, that K12 sometimes had 200 faxes in the queue, which significantly delayed response time.   Parents would then call K12

20

very upset, even in tears, because it would be past the relevant deadline by the time K12 engaged them. Eventually, the fax machine "problems got so bad" that CW7 started to have families "take pictures" of the required enrollment documents "on their smart phones" and send them to CW7.   Later, K12 substituted the fax machines with new devices and new numbers but there were still issues – the new machines and the new numbers "didn't cure the problems." CW7 reported that parents were "screaming their heads off" because they would have to call hundreds of times to get through.   Indeed, CW7 reported that the enrollment center was "so inundated with calls and craziness" that it was a "mad mess," and thus common for applicants who had timely submitted their application materials not to be admitted to one of K12's Managed Public Schools due to these issues.

60.     CW7 described the conditions in the enrollment center as "horrible" such that when the "Department Head" wrote a memo setting forth the new fax machine number and protocols, CW7 never even received one because they were not enough memos to distribute. CW7 learned of the new fax number from a colleague by happenstance.   As CW7 grew increasingly "frustrated," CW7 raised repeated concerns with supervisor Nick Brisky but said that "management didn't care."    CW7 and CW7's enrollment colleagues were "constantly constantly complaining" because they were "so frustrated" by K12's woefully inadequate infrastructure and systems.   At one point during the Class Period, CW7 even elevated these issues to CW7's supervisor's supervisor, but CW7 was ignored.

61.     Consistent with CW7's account, after the Class Period, Defendant Murray acknowledged the problems with K12's basic technology infrastructure and how it negatively impacted workflow and enrollment.   On K12's November 7, 2013 call, Murray stated that to help remedy the Company's shortcomings in 2013, K12 would be forced to "manage the

21

enrollment workflow at a much more granular level, looking at calls, faxes, documents and other work drivers literally in half-hour increments to be able to shift resources accordingly."

62.     On top of the frustrating conditions described by CW7, K12 also effectively eliminated all compensation incentives paid to its enrollment center staff during the Class Period.  According to CW1, the negative press that K12 attracted before the Class Period led K12 to drastically change its compensation structure.  Previously, K12 representatives had incentives to follow through with phone calls if they had told the initial leads that they would call them back.  K12, however, removed incentives based on hitting enrollment numbers after it was reported that K12 was allegedly paying for enrollment.

63.     According to CW5, during 2013, bonuses for enrollment consultants were capped at $1,000 (whereas the bonus cap had previously been $1,000-$8,000).  In addition, even though the enrollment consultants were salaried employees and not paid overtime, it effectively became mandatory at K12 for employees to work Saturdays during July-September 2013.  Enrollment consultants were not given additional compensation for this time but it was understood that they would be let go from K12 if they failed to put in a significant amount of overtime.

64.     This is corroborated by CW8 (a K12 Enrollment Consultant from April 2012 to November 2013) who stated that as a salaried employee CW8 did not earn overtime pay even though overtime was required, and specifically that CW8 needed to work overtime on Saturdays without additional compensation.

65.     According to CW4, prior to K12's changes to the compensation system in 2013, some employees would stay at K12 from open to close to ensure that they spoke with the families who were interested in K12 and to get more enrollments.  However, in connection with

the changes that were made, actual enrollment staff bonuses dropped to approximately $200, and the incentive was no longer there.  According to CW4, prior to K12's changes, if CW4met the goal for applications received, CW4would receive a $1,500 bonus.  If she met the goal for applications approved, CW4would receive another $2,500.  If CW4had at least 90% retention it would be another $1,500, plus another $100 for each percentage over 90%, and so on.  However, in 2013, that structure changed to combine leads received and approved into one goal that maxed out at $400.  As a result, K12 employees began leaving when their shifts ended rather than staying late.  Employees who had been with K12 for years were used to a much higher compensation level and the bonus cut was a "slap in the face," according to CW4.

66.     During the Class Period, Defendants never disclosed such facts or how K12's "staffing model" had significantly changed from the model that K12 had in place in years prior, during which K12 had reported a consistent pattern of strong growth.  To the contrary, K12's 2013 Form 10-K filed on August 29, 2013 stated that K12's programs enabled K12 to "process student enrollments, [and] meet state documentation requirements," and that K12's ability to reroute calls from parents during times of high volume allowed K12 to "mitigate operating risk in certain high volume queues."  Moreover, on May 3, 2013, Defendant Davis told investors that "we have **no concerns** in the managed schools area," and Defendant Hawks assured investors that "the underlying fundamentals in the core business remain strong."  All of these assertions were materially false and misleading.

### 2.     Chairman Davis Admitted That K12 Failed To Consider Compliance Requirements That Prevented The Company From Converting Student Applications Into Enrollments

67.     As Davis explained after the Class Period, school enrollment is a complex process because "[t]here are anywhere from 8 to 25 documents that states or schools require

23

during this process."  As a result, it is critically important that K12 employees understand the federal, state, local and school-specific requirements for student enrollment in order to properly enroll students in K12 programs, and ensure that students remain properly enrolled in them. However, as Defendant Davis admitted on K12's October 10, 2013 conference call, during the Class Period, at K12, "there were some new compliance requirements that we did not factor in appropriately into our capacity planning model for the enrollment centers."

68.    The K12 attendees on the call were asked if they could "give a little more detail on the regulations" that K12 failed to take into account during the Class Period.  Defendant Murray responded:

> What we're referring to is there's a number of states we saw increased compliancy requirements, meaning that there were additional steps imposed in the process for a student to be able to enroll.  That could be increased numbers of documents of various kinds.  It included, in some states, a requirement for face-to-face interviews as part of the enrollment process.  Those are the kinds of things we're referring to.

69.    As K12 and Defendant Murray thereby admitted, during the Class Period, K12 did not factor compliance requirements such as these into its enrollment process.  However, in its public statements during the Class Period, K12 held itself out as aware of, and in compliance with, *all* such requirements.  For example, K12's 2013 Form 10-K falsely claimed that K12 had during the Class Period "management systems and processes designed to ensure that schools . . . are in compliance with *all* applicable requirements. . . .  [and as] we have expanded into new states, our [K12's] processes have grown increasingly robust."  The 2013 Form 10-K further highlighted the Company's "enhanced" ability to "process student enrollments, [and] meet state

documentation requirements."   K12's post-Class Period disclosures have acknowledged that such assertions were materially false and misleading.

70.     Numerous CWs have corroborated that K12's compliance efforts and training were deficient during the Class Period, including with respect to K12's ability to ensure compliance with state requirements when K12 added new states to its employees' responsibilities.

71.     For example, as CW1 related, enrollment was a state specialty prior to 2013, meaning that there were only six or so K12 employees who spoke to, for example, Arizona families about Managed Public School enrollment.  As a result, those employees would be very aware of, and familiar with, new developments and other relevant issues in the state.  However, in 2013, the process changed, according to CW1, which impacted K12's ability to turn applications into real enrollments.  CW1 reported that K12 representatives had less familiarity with the individualized compliance requirements for each school that were required to complete enrollment.

72.     As further described by CW4, while CW4 had at one time been focused on only one state's Managed Public School, CW4 was assigned to work on another state during the Class Period and CW4's team was not given much notice of, or training about, that new state. CW4 explained that K12's purported enrollment specialists were simply learning as they went along.  According to CW4, even the team leads at K12's enrollment center did not really know what was going on and were confused, and there was no real training given on the new school involved.

73.     In addition, when CW6 first started at K12, CW6 was only assigned to handle potential students from Nevada and Idaho.  Then, in mid-2013, K12 added Minnesota and Wisconsin to CW6's workload.

74.     Similarly, CW7, whose focus was initially on Managed Public Schools in Texas but then got saddled with Illinois, reported that "half the time you felt stupid wondering if this document was going to be ok."  CW7 reported that understanding and explaining compliance to applicants was "like a guessing game" because the only training CW7 received was a "booklet" addressing regulations in Texas.  CW7 added that enrollment consultants who worked on compliance issues were "hungry for knowledge and answers" to questions about how to effectively convert applications to enrollments but they "didn't have enough time" to process applications and learn the rules.

75.     Likewise, CW8 initially worked with families from Idaho and Nevada, but then CW8's group also took on responsibility for Minnesota and Wisconsin in May or June of 2013, at which time CW8 dealt with all four states.  CW8 observed that the new states' policies were very different from the old states' policies, and that the timing of the assignment gave CW8 and others very little time to learn the new states' policies before the enrollment deadlines.  Each state had varying requirements, and, according to CW8, the training that K12 employees received concerning new states that were added to their area of coverage was basically worthless.  CW8's experience with the training process was that employees sat in a room for 45 minutes and were given only a general introduction to the regulatory requirements of new states that K12 employees were expected to cover.

76.     CW8 observed that, throughout K12, there were changes to employees' state assignments and the addition of more states because K12 was starting to shift to a uniform

26

national curriculum for which every state could have the same policy, but CW8 did not understand how such a shift could be feasible, given the differences between states. CW8 also reported that K12 lacked adequate staffing in 2013. In 2012, during the peak enrollment season, K12 had 15 employees working strictly on Nevada and Idaho, yet the same number of employees in 2013 after the number of states his team covered doubled from two to four. As a result, CW8's group saw more dropped or abandoned calls at K12's enrollment center.

77.     CW2 handled five different states during her tenure at K12. From March 2013 on, CW2 handled Pennsylvania and Michigan. As CW2 stated, during the Class Period, K12 enrollment staff was not properly trained. According to CW2, K12 never fully explained the enrollment process to new hires and would "pretty much throw you on the phones and you need to get it." CW2 also observed that K12 was still hiring and training employees during the peak of its enrollment season, and hence, the staff was not properly trained. By the time the new employees were able to man the phones on their own with an understanding of the enrollment steps and compliance requirements, the season was already over.

78.     Although the number of applications that K12 received in August "spiked," that sharp increase was too late in the enrollment season for K12 to convert them into enrollments in light of the lengthy average 30-day enrollment process time, looming fall 2013 school start dates, and the significant demands on the understaffed enrollment center at that time. Indeed, the Company was forced to admit after the Class Period that it was not able to convert at least 11,000 applications into enrollments because of the "compressed" enrollment window and "serious missteps" throughout the enrollment season, including compliance failures such that "there were some new compliance requirements that [K12] did not factor in" at its enrollment center. In turn, as Chairman Davis admitted on October 10, 2013: "Through the latter part of

27

August [2013], the last week in August, all the way through the end of September and into the first week in October, *we were not able to get the conversion rate*."  As Defendant Murray further acknowledged on November 7, 2013, "We generated demand too late and the spike in demand late in the season *hurt us*."

79.     Defendant Davis admitted on October 10, 2013 that K12 executives were aware that K12 was not hitting its target conversion rate just as it was experiencing a surge in applications, yet Defendants hoped (incorrectly) that K12 would somehow entirely reverse the trend that it had been observing for weeks.  In the words of Defendant Davis: "While *we saw some issues early*, those issues we thought were issues that were correcting and would all be corrected *in the September timeframe*.  *And obviously that didn't happen*."

80.     Davis thereby admitted that K12 executives knew of the lowered conversion rates "early" – *i.e.*, before the "September timeframe" – before K12 falsely publicly affirmed on analysts' consensus estimates on August 29, 2013 (and detailed below) that translated to annual revenue growth of 16.3% in fiscal 2014.  However, as set forth herein, and as Davis further admitted on October 10, 2013, the "net impact of the lower conversion rate was significant" causing K12 to disclose an enrollment shortfall on the last day of the Class Period.

### D.     Defendant Rhyu Affirmed Analysts' Consensus Estimates On August 29, 2013, Driving Up K12's Stock Price, Only To Reverse Course Weeks Later

81.     On August 29, 2013, during K12's fiscal fourth quarter 2013 earnings call, Defendant Rhyu – who had been serving as CFO for less than two months by that time – endorsed analysts' bullish consensus estimates.  While Rhyu stated that K12 would not provide a "complete suite of guidance" until October, he stated that "*we are comfortable* with the fiscal 2014 estimates posted to First Call through yesterday as follows – revenue of $986.8 million;

EBITDA of $133.5 million; EBIT of $62.8 million, net income of $36.2 million; and EPS of $0.95 a share."

82.     Defendant Rhyu's endorsement of those numbers falsely conveyed to the market that he and the other Officer Defendants participating in the August 29 call were sufficiently "comfortable with" K12's enrollment numbers at that time – just days before the start of the 2013-2014 school year when, according to Packard's May 2013 statements, "everything is ramped down" in terms of enrollment.

83.     The investment community reacted swiftly, driving K12's stock price up by 11% the next day.  Indeed, financial analysts raised their earnings estimates for K12 with some concluding that Defendant Rhyu's estimates were likely "conservative" given Defendants' other positive Class Period statements concerning the supposed strength of the Company's Managed Public School segment.

84.     For instance, as reported by BMO Capital Markets on August 29, 2013, "While management does not plan on providing FY2014 guidance until mid-October (likely the week of October 14), it did say it was comfortable with current consensus estimates.  Given the strong pipeline of new schools and expanded caps for the year, we believe this guidance (at least at the top line) may prove to be conservative. . . .  [W]e are raising our FY2014 EPS estimate to $0.95 from $0.93," to the level Defendant Rhyu stated on the August 29 call.

85.     Yet, as discussed further below, less than six weeks later, on October 8, 2013, K12 disclosed that it expected to report fiscal 2014 revenues of $905-$925 million and operating income of $53-$57 million – at least $62 million "short" of the First Call revenue estimates that Rhyu endorsed on August 29 (using the low-end of the guidance range), and as high as $81.8 million "short" of consensus estimates (using the high-end of the guidance range).

As K12 later explained, "Managed Public School enrollments fell short of internal expectations due to several factors" including the "Company's inability to convert the increased volume of student applications into enrollments at a level achieved during previous years due to performance in its enrollment centers."

86.     Significantly, Defendant Davis also later explained that, but for the performance issues at the Company's enrolment centers, K12 "would have enrolled approximately **11,000** more students in this fiscal year."   In other words, but for the serious undisclosed problems discussed above, K12 would have been able to enroll 11,000 more students at its Managed Public Schools and would have been able to earn an additional $70 million or more (based on iNACOL's estimated per student annual expenditures for online schools of between $6,400-$8,900) – putting K12's fiscal 2014 revenues squarely within the First Call estimates that Rhyu endorsed weeks earlier.   Thus, the Managed Public School enrollment shortfall translated directly into K12's financial guidance shortfall, and the Officer Defendants were plainly aware of these issues by August 29, 2013.

**E.      Defendant Packard Reaped Millions Of Dollars From Inside Stock Sales**

87.     While K12's stock price was artificially inflated during the Class Period as a result of Defendants' misstatements and omissions about the true state of K12's enrollment, marketing, and compliance practices, Packard reaped the rewards of Defendants' fraud.   The Class Period sales of K12 stock by Defendant Packard were highly unusual, and therefore suspicious, as measured by: (i) the amount and percentage of shares sold; (ii) comparison with Packard's own prior trading history, (iii) the timing of Packard's sales, and (iv) Packard's base salary.

88.     The following evaluation of Defendant Packard's selling activity is based on publicly available trading data required to be reported to the SEC on Form 4.  It analyzes the trading by Packard that occurred during the approximately eight-month Class Period (February 5, 2013 through October 8, 2013, inclusive) and during the equal-length period immediately preceding the Class Period, beginning June 3, 2012 and ending February 4, 2013 (the "Control Period").  Packard's Forms 4 filed during the Class Period and Control Period are incorporated herein by reference.

89.     As reflected in the following table, the amount and percentage of shares sold by Defendant Packard was extraordinarily large during the short Class Period:

| Transaction Date | Shares Sold | Sale Price | Conversion Price | Total Stock Holdings[5] | Gross Proceeds | Net Proceeds |
|---|---|---|---|---|---|---|
| 2013-07-15 | 18,841 | $29.94 | $13.66 | 188,008 | $564,099.54 | $306,731.48 |
| 2013-07-16 | 6,159 | $29.97 | $13.66 | 188,008 | $184,585.23 | $100,453.29 |
| 2013-07-17 | 8,000 | $29.96 | $13.66 | 188,008 | $239,680 | $130,400.00 |
| 2013-07-24 | 8,000 | $30.43 | $13.66 | 188,008 | $243,440.00 | $134,160.00 |
| 2013-07-31 | 8,000 | $30.84 | $13.66 | 188,008 | $246,720.00 | $137,440.00 |
| 2013-08-01 | 2,000 | $32.01 | $13.66 | 188,008 | $64,020.00 | $36,700.00 |
| 2013-08-07 | 8,000 | $31.09 | $13.66 | 188,008 | $248,720.00 | $139,440.00 |
| 2013-08-14 | 8,000 | $31.65 | $13.66 | 188,008 | $253,200.00 | $143,920.00 |
| 2013-08-21 | 8,000 | $30.71 | $13.66 | 188,008 | $245,680.00 | $136,400.00 |
| 2013-08-28 | 10,000 | $31.74 | $13.66 | 185,236 | $317,400.00 | $180,800.00 |
| 2013-08-29 | 10,000 | $35.01 | $23.45 | 185,236 | $350,100.00 | $115,600.00 |
| 2013-08-29 | 7,000 | $35.15 | $13.66 | 185,236 | $246,050.00 | $150,430.00 |
| 2013-09-04 | 10,000 | $36.74 | $23.45 | 185,236 | $364,400.00 | $132,900.00 |
| 2013-09-04 | 17,000 | $36.74 | $13.66 | 185,236 | $624.580.00 | $392,360.00 |
| 2013-09-11 | 10,000 | $37.41 | $23.45 | 185,236 | $636,310.00 | $237,660.00 |
| 2013-09-11 | 17,000 | $37.43 | $13.66 | 185,236 | $374,100.00 | $237,500.00 |

---

[5] The "Total Holdings" set forth in this chart were obtained directly from the Forms 4 that Packard filed with the SEC during the Class Period.  This metric does not appear to decline after each stock sale because Packard's sales pursuant to options exercises where the underlying shares were sold on the same day did not reduce his "Total Holdings" of K12 common stock.

| Transaction Date | Shares Sold | Sale Price | Conversion Price | Total Stock Holdings[5] | Gross Proceeds | Net Proceeds |
|---|---|---|---|---|---|---|
| 2013-09-18 | 5,000 | $34.68 | $23.45 | 219,709 | $448,240.00 | $143,390.00 |
| 2013-09-18 | 13,000 | $34.48 | $13.66 | 219,709 | $173,400.00 | $105,100.00 |
| 2013-09-25 | 10,000 | $31.74 | $13.66 | 219,709 | $317,400.00 | $180,800.00 |
| 2013-10-02 | 138 | $31.10 | $13.66 | 214,960 | $4,291.80 | $2,406.72 |
| 2013-10-02 | 7,862 | $31.10 | $13.66 | 214,960 | $244,508.20 | $137,113.28 |
| **TOTAL** | **192,000** | — | — | | **$6,393,924.77** | **$3,281,704.77** |

90.     As illustrated above, in just twelve weeks, Packard sold **192,000** of his personally held K12 shares, or **88%** of his total K12 stock holdings at the end of the Class Period (214,960 shares), for gross proceeds of approximately **$6.4 million** – enabling Packard to reap an average of $500,000 per week.  Taking into consideration all of Packard's exercisable options – none of which was set to expire until July 12, 2015 – Packard's sale of 192,000 K12 shares during the Class Period totaled 19% of his total K12 stock holdings at the end of the Class Period (1,020,779 exercisable options and shares).  Packard's gross and net proceeds from these sales were several times greater than his fiscal year 2012 and 2013 base salaries of $625,000 and $675,000, respectively.

91.     In addition to being massive in absolute and percentage terms, sales of K12 stock by Packard during the Class Period were extraordinary and suspicious when compared to Packard's own prior selling activity.  During the Control Period, Packard made only a single sale of his K12 common stock.  On November 12, 2012, Packard sold 40,000 shares, or 17% of his total K12 holdings at the end of the Control Period (239,700 shares), at a price of $19.71 per share for gross proceeds of $788,400.  Taking into consideration all of Packard's exercisable options, Packard's sale of 40,000 K12 shares during the Control Period equaled just 3% of his total K12 stock holdings at the end of the Class Period (1,252,108 exercisable options and

shares).  Notably, unlike his Class Period sales, the 40,000 shares that Packard sold during the

Control Period were set to expire on December 31, 2012, less than two months after he sold

them.

92.     A comparison of Packard's K12 stock sales during the Class Period as compared

to the Control Period are set forth in the following chart:



93.     As set forth in the chart above, Packard's sales increased more than **711%** during

the Class Period, from approximately $788,400 during the Control Period to nearly $6.4 million

during the Class Period.

94.     The contrast between Packard's sales during the Control Period and the Class

Period is also striking when measured in shares, rather than dollars, as set forth in the following

chart:



95.     As set forth in the chart above, the number of shares sold by Packard increased more than **380%** during the Class Period, from approximately 40,000 K12 shares during the Control Period to nearly 192,000 K12 shares during the Class Period.

96.     Furthermore, the timing of Packard's stock sales was highly suspicious because they occurred at or near the highest trading prices that K12 stock reached during the Class Period as set forth in the following chart:



97.     As illustrated in the chart above, the day after K12's stock reached its highest price of $37.85 on September 10, 2013, Packard sold 27,000 shares at prices close to that Class Period high.   Indeed, the average sale price of Packard's K12 shares was $33.30 – and **all** of the K12 shares Packard sold were above the closing price of K12 stock on October 8, 2013 after the truth was revealed at the end of the Class Period, allowing Packard to reap abnormally high returns on his K12 stock sales.

98.     Additionally, Packard's adoption of a "10b5-1 Plan" (defined below) four months into the Class Period, on June 28, 2013, is also suspiciously timed.   In 2000, to provide a safe harbor for corporate executives who sell their personally held stock, the SEC created an affirmative defense to insider trading claims for trades made pursuant to a binding agreement or plan (commonly referred to as a "10b5-1 Plan").   *See* Selective Disclosure and Insider Trading, 65 Fed. Reg. 51,716, at 51, 727-28 (Aug. 24, 2000).   Pursuant to SEC Rule 10b5-1(c), a 10b5-1 Plan is a defense to insider trading liability **only** if it is entered into by an insider "**before**

becoming aware" of inside information, and was established "in good faith and not as part of a plan or scheme to evade the prohibitions" against insider trading. Here, Packard entered into a 10b5-1 Plan deep into the Class Period on June 28, 2013, after becoming aware of the inside information detailed herein, precisely "to evade the prohibitions" against insider trading prohibited by Section 10(b) and Rule 10b-5.

99. In addition, while Defendant Packard was selling his K12 common stock on July 15, July 16, July 17, August 28, and August 29, 2013 at artificially inflated prices while in possession of material, non-public information about K12's operations, Lead Plaintiff was contemporaneously actually *purchasing* K12 common stock on the NYSE at artificially inflated prices due to Defendants' material misrepresentations and omissions, as reflected below:

| Transaction Date | Packard Shares Sold | Sale Price | Gross Proceeds | Lead Plaintiff Shares Purchased | Purchase Price |
|---|---|---|---|---|---|
| 2013-07-15 | 18,841 | $29.94 | $564,099.54 | 200 | $29.86 |
| 2013-07-15 | — | — | — | 300 | $29.91 |
| 2013-07-16 | 6,159 | $29.97 | $184,585.23 | 1,000 | $29.87 |
| 2013-07-16 | — | — | — | 400 | $29.99 |
| 2013-07-17 | 8,000 | $29.96 | $239,680.00 | 946 | $29.99 |
| 2013-08-28 | 10,000 | $31.74 | $317,400.00 | 200 | $31.99 |
| 2013-08-29 | 10,000 | $35.01 | $350,100.00 | 2,100 | $36.06 |
| 2013-08-29 | 7,000 | $35.15 | $246,050.00 | 1,400 | $36.46 |

100. Notably, Packard sold more than $6.39 million worth of stock during a short twelve-week portion of the Class Period – precisely when, unbeknownst to investors, K12 was suffering from "serious" and "self-inflicted" problems at its enrollment centers in response to the inadequate compliance and staffing issues that it concealed until October 10, 2013.

101. Moreover, neither Defendant Packard nor any other Officer Defendant purchased a single share of K12 stock on the open market during the Class Period.

102.   Further, Packard's sales occurred on dates that were very close in time to both the alleged misrepresentations and corrective disclosures in this case.  For instance, on August 29, 2013, when K12's 2013 Form 10-K was filed and Defendant Rhyu endorsed analysts' consensus estimates, Packard sold 17,000 shares that same day for nearly $600,000 in gross proceeds.   Packard also sold another 8,000 of his personally held K12 shares for nearly $250,000 just six days before the final corrective disclosure in this case on October 8, 2013.

**F.**   **The Truth Is Revealed**

103.   It was not until after the close of market on October 8, 2013 that investors learned the truth about the material deficiencies in K12's enrollment practices, and their impacts on the Company's bottom line.   K12's October 8, 2013 announcement revealed that the Company's Managed Public Schools for the 2013-2014 school year were below stated expectations because of K12's inability to convert student applications into enrollments.  K12 further announced that these deficiencies had a significant adverse impact on the Company's financial performance.  Specifically, K12 disclosed the following on October 8, 2013:

> The Company expects full fiscal year revenues in the range of $905 million to $925 million and full year operating income in the range of $53 million to $57 million. . . .
>
> [W]e believe the increase in Managed Public School enrollments fell short of internal expectations due to several factors, which include, among others: The Company's inability to convert the increased volume of student applications into enrollments at a level achieved during previous years due to performance in its enrollment centers and, to a lesser extent; The delayed start of the open enrollment period for certain schools.

104.   In other words, K12 announced on October 8, 2013 that it expected to report annual fiscal 2014 revenues of $905-$925 million, and operating income of $53-$57 million – a

37

far cry from analysts' consensus expectations of $986.8 million and $62.8 million, respectively, which Rhyu had endorsed just weeks earlier on August 29, 2013.

105.    On October 9, 2013, the first trading day after K12's revelations, K12's stock price immediately declined, falling ***38.4%*** in a single trading session, from a closing price of $28.59 on October 8, 2013 to a closing price of $17.60 on October 9, 2013.  Trading volume reached a historic level with more than 5.3 million K12 shares traded – the highest-ever trading volume.

106.    Analysts' financial reports further reflected the market's shock.  On October 9, 2013, Morgan Stanley reported that K12's "miss on fall enrollments drives a disappointing F14 outlook. . . .   [O]n August 29 it highlighted its comfort with consensus estimates. . . . Yesterday's preannouncement is well below these figures and is attributed to weak conversion trends at enrollment centers[.]"   The next day, Wells Fargo issued a report stating that, "[o]n [the] Thursday [October 10, 2013 call to discuss K12's announcement], management will likely be asked in particular to explain how the end enrollment result could ***differ so materially*** from expectations it articulated on a[n] [August 29, 2013] investor call."

107.    On the October 10, 2013 conference call to discuss K12's announcement, Davis confirmed that, contrary to Defendants' prior representations that there was "strong" enrollment at Managed Public Schools and that K12's enrollment and compliance processes had been "enhance[d]" and "grown increasingly robust" to handle increased application volume, the Company had dug itself into a "serious" enrollment "hole" for the 2013-2014 school year, such that K12 was not able to convert student applications into enrollments.  Davis stated that the "net impact of the lower conversion rate was significant."

108.    Davis also admitted that, despite Defendants' previous assurances to investors about "significant" and "strengthened" marketing efforts, K12's "own promotional program started later than it should have," and when it did start, K12 "didn't have the correct staffing model in place at [its] enrollment centers to handle the timing and the volume of applications." Davis went on to explain that, when the Company's belated marketing efforts finally launched, K12 "spent too many hours in the wrong states," even though Defendants told investors that K12 had "a conscious strategy to try to focus on marketing to states that had a higher funding rate" and that the Company was "clearly focused on where the dollars are."

109.    Defendant Davis further admitted that, contrary to Defendants' prior representations that K12 did an "amazing job" complying with state documentation requirements, the opposite was true.  Davis confirmed that the enrollment shortfall was due to "serious missteps" in connection with K12's failure to account for "new compliance requirements," explaining that "there were some new compliance requirements that we did not factor in appropriately into our capacity planning model for the enrollment centers."  For instance, as described by Defendant Murray, "increased" documentation requirements and, in some states, "a requirement for face-to-face interviews."  Such basic requirements would have been satisfied if K12 had actually "trie[d] to be way above the bar" and "comply with each and every rule and regulation," as Defendant Packard falsely stated on March 11, 2013.

110.    Significantly, Defendants Davis and Murray have now also admitted that the undisclosed Class Period problems at K12 were so pervasive that K12 has been forced to take extensive remedial measures.  On a November 7, 2013 earnings call, Murray elaborated on the extent to which K12's "forecast planning and reporting tools . . . simply weren't robust enough," and explained that there were systemic "limitations in the platform at [the Company's]

enrollment centers," notwithstanding prior representations about such systems being "enhanced" and "robust." Murray stated that K12 would have to "change the fundamental workflow in [its] enrollment process" so that K12 could "look[] at calls, faxes, documents and other work drivers literally in half-hour increments to be able to shift resources accordingly."

111.   Consequently, as Defendant Davis explained after the Class Period on the October 10, 2013 conference call, K12's enrollment planning tools had to be completely upgraded in order to "match[] the media and promotion with the staffing and the enrollment center." The Company has also had to "institut[es] better tools and analytics to monitor the enrollment application" process. Echoing the call for more compliance information in the enrollment center, Davis admitted that K12 has also had to implement a "knowledge warehouse" to enable enrollment consultants "to cover the unique [documentation] requirements of a broader set of states and schools."

112.   As described by Murray on the February 4, 2014 earnings call after the Class Period, as a direct result of K12's "self-inflicted problems" during the Class Period, K12 has only just begun to make "a number of changes to processes and systems." Murray stated that, "one of the things that hurt us in the past was the compression of our enrollment cycle," and that to address that issue K12 will be forced to materially increase its enrollment and marketing costs. K12 has also been forced to overhaul its "capacity planning, demand forecasting, and cohort tracking" systems. Thus, the widespread problems that infected the Company's enrollment operations during the Class Period continue to weigh on K12's financial performance.

## V.      ADDITIONAL SCIENTER ALLEGATIONS

113.    Numerous facts give rise to the strong inference that, throughout the Class Period, Defendants knew or recklessly disregarded that, contrary to their repeated public statements, K12's applications were declining in early 2013, K12's underlying fundamentals were not "strong" or free of any concern, and K12 was not converting student applications into enrollments at historically high rates.

114.    ***First***, Defendants have admitted that they were aware of decreasing applications. Specifically, Defendants were aware that K12's promotional efforts were generating such a low number of student applications in early 2013 that it caused K12 to change its marketing strategy in mid-2013.   Defendants further admitted that this change caused a glut of applications late in the enrollment season that pushed K12's enrollment platform to the "tipping point."   As Defendant Murray stated on November 7, 2013:

> [O]n the demand-generation side, we started the enrollment season working to increase the efficiency of our marketing spend which meant increasing our mix of digital media as a way to balance growth and financial performance.   While initial results were encouraging, ***this shift didn't produce the volume of leads and applications we had anticipated***.
>
> ***We then pivoted our investment*** to increase television advertising which generated strong demand.   ***We saw lead volumes spike and push our enrollment platform to a tipping point*** where we were unable to convert available applications, given the enrollment windows that existed.   We generated demand too late and ***the spike in demand late in the season hurt us***.

115.    By these statements, Murray admitted that K12 executives were aware during the Class Period that the Company's promotional efforts were failing, and that K12 was not achieving "the volume of leads and applications [it] had anticipated."   Despite this knowledge, Defendants failed to disclose this significant problem.   Murray also admitted that when K12

executives observed the volume of leads was too low in the March to June time period, they pivoted the Company's marketing investment.  This "pivot" and the resulting late "spike" in applications, rather than benefiting K12, "hurt" the Company.

116.   ***Second***, Defendants have admitted that they were aware of problems with the conversion of applications into enrolments.  Once K12's marketing strategy was producing an exceedingly high number of applications later in the Class Period, Defendants were aware (at least during August 2013, if not earlier) that K12's enrollment staff was not hitting its conversion rate or timely converting the pending applications into enrollments.  Specifically, on an October 10, 2013 call, Davis stated that, "Through the latter part of August [2013], the last week in August, all the way through the end of September and into the first week in October, we were not able to get the conversion rate. . . .  [W]hile we saw some issues early, those issues we thought were issues that we were correcting and would all be corrected in the September timeframe.  And obviously that didn't happen."  Davis also stated on October 10, 2013 that K12 understood during the Class Period that the Company was driving more of its "leads and applications later in the summer instead of early in the summer" and that, "***in the face of that trend***," K12 did not balance its resources appropriately.   These admissions are powerful evidence that Defendants were aware of problems with K12's conversion rate during the Class Period, while making materially false and misleading public statements to the contrary.

117.   ***Third***, after the Class Period, Defendant Davis personally took responsibility for K12's disappointing enrollment numbers, including K12's failure to convert applications to enrollments at the targeted rate.  Specifically, on October 10, 2013, Davis stated:  "We did not have the right model.  And, yes, there were changes at the top, so ***I take full responsibility***.  This

is not on anybody else; it's on my leadership."  This admission gives rise to a strong inference of scienter.

118.    **Fourth**, on October 10, 2013, Davis described K12's disappointing enrollment numbers as the result of problems that were "self-inflicted," and stated that K12 needed to make changes to avoid a recurrence of the same problems, including "matching the media and promotion with staffing in the enrollment centers so we don't overwhelm the enrollment center late in the enrollment season."

119.    **Fifth**, multiple CWs who worked in the enrollment center at K12's headquarters all internally understood during the Class Period that K12 was not hitting its application and/or enrollment numbers and that K12's changes to the enrollment center had severe negative impacts on K12's ability to convert enrollments.  Those CWs stated that such changes were implemented and monitored by K12 senior management.

120.    **Sixth**, K12 has acknowledged that the Company's management continuously monitors the number of applications and enrollments received by K12, including through its sophisticated proprietary software platform, TotalView Enrollment ("TotalView").   For example, K12's Forms 10-K filed with the SEC in August 2012 and August 2013, signed by Defendants Packard, Davis, Hawks (in 2012) and Rhyu (in 2013), both state that, K12 utilizes TotalView, a suite of online applications that provides administrators, teachers, parents and students a unified view of student progress, attendance, communications, and learning kit shipment tracking," and TotalView "includes an enrollment processing and tracking tool that allows us to ***closely monitor and manage the enrollment process*** for new students."  Those same K12 public filings also state that, "[K12] ***continually*** evaluate[s] [its] enrollment levels by state, by school and by grade [and] track[s] new student enrollments and withdrawals

43

throughout the year."  In addition, K12 "***continually*** evaluate[s] our trends in revenues by monitoring the number of enrollments in total, by state, by school and by grade, assessing the impact of changes in school funding levels and the pricing of our curriculum and educational services."  Such continuous evaluation of application and enrollment numbers revealed to the Defendants during the Class Period that K12 was not achieving its targeted application or enrollment rates.

121.   In this regard, numerous CWs observed that TotalView was a centralized repository of application and enrollment information, and that reports were generated detailing the status and volume of applications and enrollments K12 received during the Class Period:

- CW1 stated that TotalView tracked and reported student enrollment history, including weekly, monthly and quarterly totals, that K12 upper management would report numbers to the schools and executives, and that such reports were also called TotalView Enrollment.  According to CW1, reports were generated on a weekly, monthly, and quarterly basis and also sent to at least K12's "C-Suite," which includes the direct chief executives over each department line, including the Chief Marketing Officer during the Class Period, Celia Stokes.  According to CW1, generating a report involved simply pressing a button in TotalView.  In addition, senior management had access to the system and could have run their own reports, but also had lower level management run and provide reports to them.

- CW2 stated that TotalView contained all of the information and documents necessary to enroll a student, and one could break out information to track, for example, the number of applications K12 received in a week, or how many enrollments K12 had in a certain state.  As CW2 added, all management, the heads of schools, enrollment consultants and counselors had access to TotalView.

- CW4 stated that everyone at K12 headquarters, including K12 senior management, had access to TotalView and that one could track the status of enrollments going back years.  According to CW4, TotalView stores and updates information about the status of applications in real time.

- According to CW5, TotalView tracked the status of everything related to enrollment and could display the number of students who had been approved or were not compliant, and the exact paperwork missing for each student.  According

to CW5, "it told us everything," and K12 management closely monitored application and enrollment numbers because it affected K12's revenue, making it a daily "numbers game" to review how many applications were needed to reach stated goals.

- CW8 stated that management (including CW8's supervisor and those above the supervisor) had access to K12's enrollment numbers, and such numbers related to the Company's goals and profits.  According to CW8, in 2013, CW8 could tell weekly that CW8's team was not hitting the goals, whereas they had during the prior year.

122.   **Seventh**, K12 has specifically touted its capacity to monitor and scrutinize the efficiency of its enrollment center.  One of K12's pre-Class Period SEC filings stated that:

> [W]e quantify sales and marketing efficiency including ***the number of new enrollment prospects for virtual public schools, our ability to convert these prospects into enrollments, and our cost effectiveness of conversion***.  We also review various call center statistics as indicators of operating efficiency and customer service including ***call handle rates***, ***waiting time and customer satisfaction***.

123.   K12's own claimed monitoring and scrutiny of its enrollment prospects, conversion rates, call handle rates, waiting time, follow-up time, and customer satisfaction would have further led Defendants to understand that the Company's applications were down in the first half of 2013, that K12 was not hitting its conversion rate over the Summer of 2013, and that K12 would not meet its own, or analysts', estimates for K12's enrollment and revenues.

124.   **Eighth**, the Officer Defendants' own public statements during the Class Period led the market to believe that they possessed detailed personal knowledge of the specific aspects of K12's business required to support their statements.  Those same aspects of K12's business are the same factors that K12 later blamed for the shortfall in K12's 2013 enrollments.  For example:

45

- On February 5, 2013, Defendant Murray held himself out to the public as familiar with K12's marketing efforts and enrollment center when he falsely claimed that K12's marketing efforts were "clearly focused on where the dollars are" and that K12's enrollment center typically generated favorable conversion rates;

- On May 3, 2013, Defendant Hawks held himself out as familiar with K12's underlying enrollment numbers, falsely assuring investors that "the underlying fundamentals in the core business remain strong, specifically enrollment";

- On May 3, 2013, Defendant Packard held himself out as personally knowledgeable about 6,000-7,000 students being the most reasonable estimate of the number of enrollments that he believed K12 could enroll in Michigan under that state's increased enrollment caps in 2013 (which was exaggerated and not in conformity with K12's much lower internal estimate of 4,500 students at K12's main Michigan Managed Public School);

- On August 29, 2013, Defendant Davis held himself out as familiar with K12's marketing efforts and the Company's ability to capture enrollments when he falsely claimed that, "we have a significant marketing effort going on right now to try to capture many of these new enrollments";

- On August 29, 2013, Defendant Murray held himself out as familiar with K12's compliance and enrollment efforts when he misleadingly claimed that K12 was "doing more face-to-face interviews as part of the enrollment process" without disclosing that the need to perform those interviews was exacerbating the bottle-neck of applications in K12's enrollment center; and

- On August 29, 2013, Defendant Rhyu held himself out as familiar with K12's ability to generate sufficient enrollments to meet analyst guidance when he falsely claimed that, "[W]e are comfortable with the fiscal 2014 estimates posted to First Call through yesterday as follows – revenue of $986.8 million; EBITDA of $133.5 million; EBIT of $62.8 million, net income of $36.2 million; and EPS of $0.95 a share."

125.   All such statements conveyed to investors the impression that these Officer Defendants were personally familiar with facts underlying these assertions, although Defendants' assertions are in fact materially false and misleading.

126.   *Ninth*, Murray was hired at K12 in mid-2012 as K12's COO, and was described at the time as someone with a "niche for turning around companies."   Murray was himself

46

directly involved in the details of running K12.  In his own words, he drew his success from "sweat[ing] all the details to make sure you operate [the business's] process effectively."

127.    **Tenth**, the short amount of time between K12's Class Period public statements, including the 2013 Form 10-K filed on August 29, 2013 and the false statement reaffirming analyst guidance and the Company's October 8, 2013 disclosure annoucing the enrollment shortfall and missing that guidance, supports a strong inference that K12 and the Officer Defendants acted knowingly or recklessly when making the alleged and false leading statements.

128.    **Eleventh**, the magnitude of K12's enrollment shortfall, and the seriousness of the issues that caused it, support that Defendants were aware of the shortfall and its causes during the Class Period, or recklessly disregarded them.  As Defendant Davis stated on October 10, 2013, "These 2014 enrollments were **well below** our expectations, and we made some **serious missteps** this enrollment season."  Davis added that, "The net impact of the lower conversion rate was **significant**." Similarly, analysts were astonished by the magnitude of K12's enrollment numbers and how they could differ so materially just weeks after K12 affirmed analysts' much higher guidance.  For example:

- Morgan Stanley analysts wrote on October 9, 2013 that, "on August 29 [K12 management] highlighted its comfort with consensus estimates, which at the time were $987M rev, $135.5M EBITDA and $62.8M EBIT.   Yesterday's preannouncement is **well below these figures**";

- On October 10, 2013, analysts at Wells Fargo Securities similarly wrote that, "management will likely be asked in particular to explain how the end enrollment result could **differ so materially** from expectations it articulated on a[n August 29, 2013] investor call"; and

- An October 11, 2013 BMO Capital Markets report emphasized that, "Traditionally, FY1Q has historically been the largest revenue-generating quarter

47

of the year; the apparent change this year **will likely further exacerbate investor concerns**.”

129.    As Defendant Davis admitted on November 7, 2013, “[W]e did more than stub our toe in [the] enrollment season.”

130.    **Twelfth**, before and during the Class Period, the Officer Defendants recognized that K12’s business depends heavily on its ability to enroll students.  For years before the Class Period, K12 repeatedly told the market that K12’s Managed Public Schools business was its “core business,” and that such business would experience unbridled, and even accelerated, growth in enrollments through the Class Period and into the present.  This consistent historic pattern provides strong evidence that the Officer Defendants were keenly focused on K12’s application and enrollment numbers during the Class Period in order to know whether K12 could maintain its history of reported growth.  For example:

- On February 15, 2011, Defendant Packard stated that, “[t]his business continues to grow very well organically . . ., and we actually see an **acceleration of the business growth for the core business**.”

- On May 10, 2011, K12 Vice President of Financial Analysis and Investor Relations, Keith Haas, stated that, “because our core public virtual school business is growing so rapidly and . . . **could even accelerate from where it is,** we expect that to be the dominant part of our business certainly **for the next 5 years**.”

- On October 10, 2011, Defendant Hawks stated that, “As our core business of providing curriculum, technology and services to virtual charter schools across the country represents approximately 85% of our revenue, **it’s very important to point out its robust health and excellent operational and financial results**.”

- On December 4, 2012, Defendant Packard stated that, “You can see the three pillars and how they have grown.  **The core business from 2011 to 2012 grew at 36%**. We also have the institutional business growing at 55% and the private pay growing at 77%.  **So all of our pillars are pillars that we believe have large growth opportunities and also a lot of runway before they asymptote out**.”

48

131.    Historically, as these examples demonstrate, Defendants Packard and Hawks –
the longest-standing Officer Defendants at the outset of the Class Period, together with
Defendant Davis – have been personally very focused on the growth rate of K12's core
business, including the growth of K12's enrollments.  The sharp decline in K12's applications in
early 2013 and the drop in K12's rate of growth in its enrollment numbers in 2013 jeopardized
K12's history of reported growth in that core business.  The significance of that change –
particularly in light of Defendants Packard and Hawks' prior statements – is further strong
evidence that Packard and Hawks, as well as the other Officer Defendants, knew of (or
recklessly disregarded) K12's disappointing application and enrollment numbers during the
Class Period.  As Defendant Davis stated on February 4, 2014, with respect to K12's virtual
school programs, "*the real revenue there comes from more students enrolling in the
program*," which depends on "how good our enrollment efforts were."  Davis continued, "And
of course this year we didn't deliver on our own expectations.  So *that was down, but that's
something we expect to be up*."

132.    *Thirteenth*, the fact that Defendants repeatedly made false statements about the
single most important issue facing the Company's core business is compelling evidence of
recklessness at a minimum.  As set forth in detail above, K12's contracts with Managed Public
Schools were the key driver of K12's growth, and thus, directly impacted its stock price.  K12
acknowledges that its revenues are concentrated in the Managed Public Schools segment and
that Managed Public Schools "will continue to represent the majority of [K12's] total revenues
over the next 12-24 months."  As K12 stated in its 2013 Form 10-K, "The majority of our
revenue is derived from long-term service agreements with the governing authorities of the
virtual public schools that we serve."  The Form 10-K added that, "We generate a significant

49

portion of our revenues from the sale of curriculum, management and technology services to managed virtual and blended public schools, where we provide turn-key management services. Approximately 86% of our revenues were derived from this source in fiscal year 2013."  The Form 10-K also identified, as the first item under "Factors affecting our revenues" "the number of enrollments."  The fact that the Officer Defendants unequivocally assured the market during the Class Period that the fundamentals of K12's core business were sound, and that K12 would hit consensus estimates, while the Company was in fact continuing to miss its rate of converting applications to enrollments, is strong evidence of Defendants' knowing and extremely reckless behavior.

133.   **Fourteenth**, as discussed above, while in possession of material, nonpublic information regarding K12's declining applications in the first half of 2013 and K12's inability to convert those applications to enrollments, Defendant Packard sold substantial amounts of K12 common stock at artificially inflated prices during the Class Period, reaping enormous profits.  The prices at which Defendant Packard sold his stock (*i.e.*, from $29.94 to $37.43) far exceeded the closing price of K12 stock after the truth emerged about K12's actual fiscal 2014 revenue guidance (*i.e.*, $17.60 on October 9, 2013).  Notably, neither Defendant Packard nor any other Officer Defendant purchased a single share of K12 stock on the open market during the Class Period.

134.   **Fifteenth**, as officers and directors of K12 who received significant compensation and other benefits from their service as officers of K12, and who exercised control over K12's public statements, including making a number of materially false and misleading statements alleged herein themselves, the Officer Defendants had the motive and opportunity to commit the fraudulent acts alleged herein.

50

## VI.    MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

135.    As set forth below, throughout the Class Period, Defendants K12, Davis, Packard, Murray, Hawks, and Rhyu made numerous materially false and misleading statements in which they misrepresented the true state of K12's enrollment operations, including the Company's capabilities in marketing, enrollment staffing and other resources, and state documentation compliance practices.  In doing so, Defendants also failed to disclose material information concerning K12's ability to convert student applications into enrollments for the 2013-2014 school year, and the subsequent negative financial ramifications on K12's fiscal 2014 performance.

### A.    The February 5, 2013 Conference Call

136.    On February 5, 2013, at 6:00 A.M. Eastern Time, K12 issued a press release announcing financial results for the second quarter of fiscal 2013, ended December 31, 2012. The press release reported increased revenue and highlighted that the increase "was primarily due to organic revenue growth" in K12's "core Managed Public Schools business."

137.    Then, at 8:30 A.M. Eastern Time on February 5, 2013, K12 held an earnings conference call.  During the call, Murray touted K12's supposedly targeted marketing efforts. Murray assured investors that K12 was focused on marketing in states with the best opportunities for K12 to earn profits, and that K12 had invested in superior "processes" to capture those opportunities.  Specifically, Murray stated that, "as we rolled out our initial plan for this year[,] [w]e . . . *focus[ed] on marketing to states that had a higher funding rate*.  *We have invested in some of the systems and the tools and the processes to affect the revenue capture rates*."  Murray added that, "[a]s you look at marketing and enrollment costs, those are

large segments of our [K12's] income statement.  ***So we are clearly focused on where the dollars are***" in terms of allocating marketing expenses.

138.    Defendant Murray's statements were materially false and misleading when made.  Contrary to Murray's representations that K12 was "focus[ed] on marketing to states" with "higher funding rate[s]" and that K12 had invested in "systems and the tools and the processes to affect the revenue capture" in those states, Defendant Davis admitted on October 10, 2013 that K12's "promotional program started later than it should have" and, when it did start, K12 "didn't have the correct staffing model in place at [its] enrollment centers to handle the timing and the volume of applications."  Further, as Defendant Davis also admitted, contrary to Murray's representation that K12's promotional program was "clearly focused on where the dollars are" (*i.e.*, in states with "higher funding rate[s]"), once K12's belated marketing efforts finally launched, K12 "***spent too many hours in the wrong states***."   Indeed, after the Class Period on November 7, 2013, Murray admitted that K12's "forecast planning and reporting tools . . . simply weren't robust enough" to affect the revenue capture rates or otherwise effectively administer the Company's enrollment process.  Moreover, rather than being "focused on where the dollars are," the promotional plan was directed to a national audience rather than targeted to particular states.  Indeed, this promotional plan led to weaker leads and inquiries from students who were not eligible for Managed Public Schools programs.

139.    In addition to addressing the Company's purported promotional program on the February 5, 2013 call, Defendant Murray also touted K12's ability to convert student applications into enrollments by driving traffic to K12's enrollment centers through links in mobile advertisements that allowed applicants to automatically dial the Company's enrollment center and complete a school application promptly over the phone.  Specifically, Murray stated

that K12 "implemented click-to-call functionality on our mobile advertising pages, ***driving higher call volumes to our enrollment center, where we typically see conversion rates that are generally double that of Web forms***."

140.   Defendant Murray's statements were materially false and misleading when made.  It was false and misleading for Murray to represent that higher call volumes to K12's enrollment center could drive higher conversion rates (much less double that of Web forms) because K12's enrollment center was totally understaffed and "overwhelmed" throughout the Class Period, as admitted by Defendant Davis on October 10, 2013, and corroborated by numerous CWs.  Accordingly, regardless of any "higher call volume" resulting from "click-to-call functionality," as Davis admitted after the Class Period, K12 "didn't have the correct staffing model" at its enrollment centers, and thus "just didn't have enough people and enough process in place to" convert applications into enrollments for the 2013-2014 school year.  As Defendant Murray himself similarly admitted, "where the process broke down was in converting those applications to enrollments," because K12 made "serious missteps [throughout the] enrollment season."  Indeed, on November 7, 2013, Murray admitted that K12's "forecast planning and reporting tools . . . simply weren't robust enough" to effectively administer K12's enrollment process – no matter how high the call volume.

141.   Defendant Murray's statements on February 5, 2013 concerning K12's purportedly targeted and timely marketing tactics and effective enrollment systems were material to investors.  Numerous financial analysts reacted favorably to Murray's statements. For instance, Credit Suisse increased its earnings estimates based on K12's positive statements on the February 5, 2013 call, reporting that "Execution [Was] In Focus" at K12.  Credit Suisse further reported that K12 was "targeting marketing towards states with higher funding levels,"

and thus trends reflecting higher revenue per student remained favorable. Barrington Research also reaffirmed its "outperform" rating on K12 on February 5, 2013, reporting that "enrollment growth [at K12's Managed Public Schools] should continue" in light of "management's continued focus on higher funding states, improving its revenue capture rates."

142. As a result of Defendants' positive statements on February 5, 2013, the Company's stock price increased by approximately 11% over the course of the next two days, from a closing price of $18.31 on February 5 to a closing price of $20.29 on February 7, 2013.

**B.     The March 11, 2013 Industry Conference**

143. On March 11, 2013, at the Credit Suisse Global Services industry conference, Defendant Packard addressed the investment community. Packard emphasized that he and K12's other senior executives "know how to manage schools. We know how to manage relationships with school districts, with states," and "we've learned how to market to the consumer." Such expertise is critical to K12's business because, as Packard explained, K12 operates in a "highly, highly regulated environment," with Managed Public Schools "operating under 34 different state auditing regimes with different rules and regulations, [and] different standards."

144. Against this backdrop, Packard stated that **K12 "is a Company that takes . . . compliance very seriously and tries to be way above the bar** because of the scrutiny level we are under, but also [because] it's the right thing to do." Packard assured the investment community that "**we try to jump way over the bar and make sure we comply with every rule and regulation**." Packard also highlighted "**all of the sophisticated things [K12] do[es]**" to recruit and enroll students while ensuring compliance with all applicable laws. He further stated that "**we do an amazing job at this**."

54

145.     Defendant Packard's statements were materially false and misleading when made.  Contrary to Packard's representations that K12 took "compliance very seriously" and did an "amazing job" ensuring compliance "with every rule and regulation" using a "sophisticated" approach, in reality, "there were some new compliance requirements that [K12] did not factor in appropriately into [its] capacity planning model for the enrollment centers," as Defendant Davis admitted on October 10, 2013.   Defendant Murray further admitted on November 7, 2013 that, after the Class Period, K12 actually had to implement a "knowledge warehouse" to enable Company enrollment consultants "to cover the unique [documentation] requirements of a broader set of states and schools."  These remedial measures are consistent with the accounts of numerous CWs who reported that K12's enrollment process was the antithesis of "sophisticated" during the Class Period.  K12's own former enrollment employees reported that they were saddled with more states during the Class Period than in prior years – and were learning as they went along on an ad hoc basis.

146.     In addition to his statements about compliance at the March 11, 2013 conference, Packard also represented that "high growth rates can be sustained [at] K12 for a long time to come. . . .  So we can grow at a high rate for a long time."  Packard further assured investors that there was not a single growth impediment in sight, stating: "One of the great things about K12, and at its heart, **K12 is a growth company.  And it's rare, I think, you see a growth company that has really no asymptote in sight**."

147.     Defendant Packard's statements were materially false and misleading when made.  It was false and misleading for Packard to tout K12's supposedly unimpeded growth in mid-March 2013 when, in reality, there were numerous "asymptotes" standing in the way of K12's revenue growth at that time.  As an initial matter, K12 saw a trend in dropping application

numbers that started as early as January 2013.  As Defendant Davis admitted after the Class

Period, "During March to June of 2013, [K12] received 9% fewer applications than [it] did

during the timeframe one year earlier in 2012."  The decline in K12's applications in early 2013

was a red flag that K12's growth prospects had also declined.

148.    Moreover, it was also misleading for Packard to tout K12's unimpeded ability to

grow when, in fact, the Company had implemented sweeping changes that devastated K12's

enrollment center.  As detailed above, the Officer Defendants significantly transformed K12's

enrollment center without ever disclosing that there was change afoot, such that they: (i)

reorganized the staffing model of the K12 enrollment center; (ii) changed or increased the

number of states for which each employee in the enrollment center was responsible; (iii)

significantly reduced the incentives that K12 paid its enrollment staff; and (iv) instituted an

implied requirement that enrollment staff work weekends without overtime pay.  These changes

drove K12's enrollment call center to be totally understaffed and "overwhelmed" throughout the

Class Period, as admitted by Defendant Davis on October 10, 2013.  As further reported by

numerous CWs, K12's enrollment center was so understaffed and "overwhelmed" that calls and

faxes were repeatedly dropped, unanswered, or never received.  As Davis admitted after the

Class Period, K12 "didn't have the correct staffing model" at its enrollment centers, and thus

"just didn't have enough people and enough process in place to" convert applications into

student enrollments for the 2013-2014 school year, as the Company admitted on October 8,

2013.

149.    In short, all of these undisclosed changes were "serious missteps" that caused a

significant decline in K12's rate of conversion of applications to new enrollments throughout

the Class Period, lower student enrollments at Managed Public Schools in the 2013-2014 school

year, and extremely disappointing financial outlook for fiscal 2014 as announced on the last day

of the Class Period.

### C.   The May 3, 2013 Conference Call

150.   On May 3, 2013, at 6:00 A.M. Eastern Time, K12 issued a press release

announcing financial results for the third quarter of fiscal 2013 ended March 31, 2013.  K12's

total revenue for the quarter represented a 22% year-over-year increase.

151.   Then, at 7:30 A.M. Eastern Time on May 3, 2013, K12 held an earnings

conference call.  On the call, Defendant Davis reassured investors that K12's core Managed

Public School segment was in good shape and performing better than expected, such that there

were "no concerns in the managed schools area" whatsoever.  Specifically, Davis stated

> [W]e're in good shape in managed schools, it's performing as we
> expected, matter-of-fact better than we expected.  That remains our
> focus for the next few years.  So, we're actually pretty proud that
> we have no concerns in the managed schools area.

152.   Also during the May 3, 2013 call, Defendant Hawks preemptively addressed

three questions regarding K12's business outlook for each business segment.  While Hawks

identified weaknesses in the Institutional Sales and Private Pay segments, he emphasized the

continued strength of K12's Managed Public Schools segment – "specifically enrollment."

Hawks stated:

> Number one, why did Q3 turn out better than we thought on
> February 5?  First, enrollment and retention in our core business
> were better than our internal forecast for the period. . . .
>
> Second question you may have, why is the implicit fourth-quarter
> outlook somewhat below what we thought on February 5?  . . .
> We see continued weakness in our institutional business,
> potentially resulting in flat year-over-year performance for this
> group.  Internal and private pay while growing, is expected to be

below our internal expectations, and additional expenses are expected in the fourth-quarter associated with management changes and additions.

Third question you may have, why did we reduce the full-year revenue outlook to the lower half of our previous range? Simply it was the factors above.  Particularly though, the weakness in institutional, and a delay in certain funding increases. ***However, the underlying fundamentals in the core business remain strong, specifically enrollment***.

153.    These statements made by Defendants Davis and Hawks were materially false and misleading when made.   Contrary to their representations that student enrollment "remain[ed] strong," that the Managed Public School segment was "in good shape," and that there were "no concerns" in the Managed Public School segment, there were numerous causes for "concern" – as the enrollment season was off to an incredibly weak start.  K12 had seen a trend in dropping application numbers that started as early as January 2013.     In fact, as Defendant Davis admitted after the Class Period on October 10, 2013, "During March to June of 2013, we received 9% fewer applications than we did during the timeframe one year earlier in 2012."  The decline in K12's applications in early 2013 was a red flag that K12's growth prospects were also on the decline.   Moreover, it was also misleading to state that there were "no concerns" in the Managed Public School segment because, by this time, the Company had implemented sweeping changes that devastated K12's enrollment center.  As detailed above, the Officer Defendants significantly transformed K12's enrollment center without ever disclosing that change was afoot.   These changes drove K12's enrollment call center to be totally understaffed and "overwhelmed" throughout the Class Period, as admitted by Defendant Davis on October 10, 2013.  As further reported by numerous CWs, K12's enrollment center was so understaffed and "overwhelmed" that hundreds of calls and faxes were dropped, unanswered, or

never received.  As Davis admitted after the Class Period, K12 "didn't have the correct staffing model" at its enrollment centers, and thus "just didn't have enough people and enough process in place to" convert applications into student enrollments for the 2013-2014 school year. Indeed, Defendants similarly admitted that "where the process broke down was in converting those applications to enrollments," because K12 made "serious missteps [throughout the] enrollment season."  In short, these undisclosed changes were among the "serious missteps" that caused a significant decline in K12's rate of conversion of applications to new enrollments throughout the Class Period, lower student enrollments at Managed Public Schools in 2013-2014 school year, and extremely disappointing fiscal 2014 financial guidance on the last day of the Class Period.

154.   In addition to the foregoing statements on the May 3, 2013 call, Defendant Packard emphasized purported data indicating that growth from new Managed Public Schools and expanded enrollment caps at existing Managed Public Schools was "dramatically larger" than ever before, driving "even higher growth for fiscal 2014."  Specifically, Packard stated on the May 3 call:

> We are on track to have one of the best business development years in our history. . . . [O]ur growth rate can be significantly increased by new schools, and expansion of enrollment and caps in cap states.  ***For the upcoming fall, we have already secured cap expansion of 12,800 additional enrollment slots***. . . .  While there is no guarantee that we will fill all of these slots, ***the pent up demand, referral network, and existing school infrastructure, make these slots easier to fill than slots for students in new states***.

155.   Packard further commented on the enrollment cap expansion in Michigan – which increased from 1,000 students to 10,000 in the 2013-2014 school year – and estimated

that K12 would be able to increase its student enrollments at Michigan-based Managed Public

Schools to 6,000 or 7,000 in the 2013-2014 school year.  Specifically, Packard stated:

> Usually and historically *when we receive cap expansions we've actually generally gone to 100% the first year*.  However, we have never experienced anything as large as Michigan where you're going from 1,000 to 10,000.  *So, I think being at 60% or 70% may actually be a reasonable estimate*.

156.    Further, Packard stated that he was "*looking forward to strong Fall enrollment*"

for the "2013, 2014 school year" due in part to "cap expansion" as well as "increased for pupil

funding, the continued mainstream of online education, the new state pipeline, and the

improvements to [K12's] offering."   He added that *these growth drivers* "*exceeded our*

*expectations.*"   Packard also made clear that, to the extent there would be additional upside

from more cap expansions or new states, such data was expected to be "in place by July" such

that "*certainly by early August everything is ramped down*" in terms of recruiting and

enrollment.

157.    The statements made by Defendant Packard were materially false and

misleading.  To start, contrary to Packard's representation that K12 would be able to fill "60%

or 70%" of the 10,000 student slots available in Michigan for the 2013-2014 school year, in

fact, K12 had already set a substantially lower internal enrollment goal of 45-50% of the cap at

its largest Michigan-based Managed Public School, the Michigan Virtual Charter Academy

("MVCA").[6]  CW9 worked at MVCA from 2010 through September 2013.  By the time of

CW9's departure, CW9 was essentially working as a K12 enrollment consultant in Michigan.

---

[6]  The only other K12 Michigan school, Michigan Great Lakes Virtual Academy, was new to Michigan in the 2013-2014 school year and is not listed in K12's annual Academic Report for 2014.  It has been reported that, as of January 2014, Michigan Great Lakes Virtual Academy had only enrolled 422 students.

60

CW9 observed (including from weekly K12 enrollment meetings) that K12 internally understood that 4,500 students (rather than 6,000 or 7,000) was the number of students K12 believed it could realistically enroll at MVCA.  CW9 stated that the 4,500 target came as a surprise to the K12 employees, who were relieved to learn they were not trying to enroll more. By the time that CW9 left in September 2013, K12 had enrolled 4,700 students at MVCA (short of the 6,000-7,000 estimate for Michigan that Packard had given on May 3, 2013).  CW9 also stated that, although K12 would refer to Michigan's "explosive growth," her staff was not provided with extra office support or a test coordinator in 2013.  Instead, the Michigan school office was significantly understaffed to handle the influx of new enrollments.

158.   Additionally, contrary to Packard's representation that student enrollment slots created by cap expansions were "easier to fill" than slots for students in new states, they were not.  No matter what the source – new states or new caps – K12 was suffering from an inability to convert student applications into enrollments because its enrollment center was understaffed and "overwhelmed."  As Defendant Murray later admitted, "where the process broke down was in converting those applications to enrollments."  Moreover, it was false and misleading for Packard to represent that he expected "strong Fall enrollment" for the 2013-2014 school year given that, as Davis admitted after the Class Period, the Company had made "serious missteps [throughout the] enrollment season."

159.   Further, it was misleading for Defendant Packard to state that "by early August everything is ramped down," in terms of enrollment when, in fact, the Company's marketing and enrollment efforts were just beginning to ramp up in the August/September 2013 timeframe, such that they led to a glut in applications too late in the summer for K12's dysfunctional enrollment center to handle.  As Davis admitted after the Class Period, the Company's financial

guidance shortfall was caused by the fact that K12's own promotional program "started later than it should have, and drove more leads and applications later in the summer instead of early in the summer," which "shortened the time that [K12] had to help parents with all of the documentation required to complete the enrollment."    Further, as admitted by Murray on February 4, 2014, "compression of the enrollment cycle," which was caused by the Company's delayed promotional plan, had "hurt" the Company's ability to convert applications into enrollments because it did not leave sufficient time.

160.    In addition to the above-discussed misstatements on the May 3, 2013 call, Defendant Murray touted the steps that K12 had taken to implement heightened auditing and market science techniques in order to improve "enrollment performance" and achieve "greater operational excellence in [K12's] marketing efforts."  Specifically, Murray stated:

> [O]ur marketing and enrollment performance . . . [have been] [a]ided by the implementation of further SCO [supply chain operations] improvements, and more robust display advertising, auditing, and attribution analytics to strengthen our market science, and improve efficiency and yield.  We also began testing in a variety of ways to better respond to our families, including extended weekday and weekend hours, and click to chat.  These actions are all indicative of our efforts to drive greater operational excellence in our marketing efforts.

161.    These statements made by Defendant Murray were materially false and misleading.  First, it was false and misleading for Defendant Murray to represent that K12 had implemented heightened auditing and market science techniques to improve "enrollment performance" by May 3 when, in reality, as Defendant Davis admitted after the Class Period on October 10, 2013, K12's "own promotional program started later than it should have."  Second, it was false and misleading for Murray to state that K12 had taken steps to achieve and "drive

greater operational excellence in [its] marketing efforts" by May 3 because, as Defendant Davis admitted on October 10, 2013, K12's belated marketing strategy led to a glut in applications too late in the summer for K12's dysfunctional enrollment center to handle.  As described by Davis after the Class Period, K12's inability to convert applications to enrollments was directly "caused by the fact that [K12's] own promotional program started later than it should have, and drove more leads and applications later in the summer instead of early in the summer," which "shortened the time that [K12] had to help parents with all of the documentation required to complete the enrollment."   Indeed, on November 7, 2013, Murray admitted that K12's "forecast planning and reporting tools . . . simply weren't robust enough" to handle the marketing and enrollment performance promised on May 3, 2013.  Murray further admitted on February 4, 2014, that the "compress[ed]" enrollment window hurt K12's ability to convert applications into Managed Public School enrollments.

162.    The statements made by Defendants Murray, Packard, Davis, and Hawks on May 3, 2013 concerning K12's purportedly "strong Fall enrollment," and growth prospects in Michigan and elsewhere were material to investors.   Numerous financial analysts reacted favorably to these Officer Defendants' statements.   For instance, analysts at BMO Capital Markets issued a research report later in the day on May 3 highlighting Defendant Packard's remarks about K12 being "on track to have one of the best business development years" ever. Similarly, on May 7, 2013, analysts at Wells Fargo Securities issued a report explaining that their "view of [K12] shares has improved as a result of the strong FY2014 new business outlook."

163.   As a result of Defendants' positive statements on May 3, 2013, K12's stock price increased by approximately 3% from a closing price of $24.90 on May 2, 2013 to a closing price of $25.74 on May 3, 2013.

**D.     The 2013 Form 10-K**

164.   On August 29, 2013, K12 filed the 2013 Form 10-K with the SEC.  The 2013 Form 10-K contained K12's financial results for the fourth quarter of fiscal 2013 and full year ended June 30, 2013, which exceeded analysts' estimates and reflected nearly 20% annual revenue growth.  The 2013 Form 10-K also contained materially false and misleading statements and failed to disclose materials facts about the Company's enrollment, the adequacy of the Company's enrollment infrastructure, and state documentation compliance practices.

165.   In a section of the 2013 Form 10-K titled "Compliance and Tracking Services," K12 touted the fact that the Company had developed "***management systems and processes designed to ensure that schools . . . are in compliance with all applicable requirements. . . . *** For example, we collect enrollment related information. . . .  As we have expanded into new states, *our processes have grown increasingly robust*."  The 2013 Form 10-K also stated the recent "***enhance[ment]" of the Company's*** "***proprietary computer software programs to provide specific functionality to . . . enable[s] [K12] to develop courses, process student enrollments, [and] meet state documentation requirements***."

166.   These statements in the 2013 Form 10-K were materially false and misleading when made.  Contrary to representations in the 2013 Form 10-K that K12's enrollment and state documentation compliance processes had been enhanced and "grown increasingly robust," as Defendant Davis admitted after the Class Period on November 7, 2013, K12's "forecast planning and reporting tools . . . simply weren't robust enough" during the Class Period and

there were systemic "limitations in the platform at [the Company's] enrollment centers." Further, the Company's student enrollment and compliance "processes" were so deficient during the Class Period that "there were some new compliance requirements that [K12] did not factor in appropriately into [its] capacity planning model for the enrollment centers," as Defendant Davis admitted on October 10, 2013. Defendant Davis further admitted on November 7, 2013 that, after the Class Period, K12 actually had to implement a "knowledge warehouse" to enable its enrollment consultants "to cover the unique [documentation] requirements of a broader set of states and schools." These remedial measures are consistent with the accounts of numerous CWs who reported that K12's enrollment process was the antithesis of "robust" during the Class Period. K12's own former enrollment employees reported uniformly that they were saddled with more states during the Class Period than in prior years – and were learning as they went along on an ad hoc basis. Notably, even the Company's Enrollment Team Leaders were confused by varying state documentation requirements, and there was no real training provided by the Company on state-specific compliance requirements.

167.     Moreover, the 2013 Form 10-K assured investors that, "[t]o mitigate operating risk in certain high volume queues" such as the Company' "primary enrollment center operations" due to high student enrollment demand, K12 "ha[d] the ability to reroute calls to other facilities if a certain facility is unable to temporarily service calls."

168.     These statements in the 2013 Form 10-K were materially false and misleading when made. It was false and misleading for the Defendants to represent that K12 had the ability to readily "reroute calls" from potential enrollees when, in fact, K12's enrollment call center was totally understaffed and "overwhelmed" throughout the Class Period, as admitted by Defendant Davis on October 10, 2013. As further reported by several CWs, K12's enrollment

center was so understaffed and "overwhelmed" that hundreds of calls and faxes were dropped, unanswered, or never received.  As Davis admitted after the Class Period, K12 "didn't have the correct staffing model" at its enrollment centers, and thus "just didn't have enough people and enough process in place to" timely reroute calls and, ultimately, convert applications into student enrollments for the 2013-2014 school year.

169.   In addition, while the 2013 Form 10-K disclosed that "any significant interruption in the operation of any primary facility . . . *could* reduce" K12's "ability to respond to service requests, receive and process orders and provide products and services, which *could* result in lost and cancelled sales," such representations were materially false and misleading because, by June 30, 2013, as Defendants later admitted, "significant interruption[s]" had *already* occurred, which caused material negative impacts on K12's business by reducing K12's ability to convert student applications to student enrollments for the 2013-2014 school year.  As detailed above, by the time the 2013 Form 10-K was filed, K12 had implemented sweeping changes that caused "significant interruption[s]" at K12's enrollment center.  As detailed above, the Officer Defendants significantly transformed K12's enrollment center without ever disclosing that there was change afoot, such that they: (i) reorganized the staffing model of the K12 enrollment center; (ii) changed or increased the number of states for which each employee in the enrollment center was responsible; (iii) significantly reduced the incentives that K12 paid its enrollment staff; and (iv) instituted an implied requirement that enrollment staff work weekends without overtime pay.  These "significant interruption[s]" drove K12's enrollment call center to be totally understaffed and "overwhelmed" throughout the Class Period, as admitted by Defendant Davis on October 10, 2013.  As further reported by numerous CWs, K12's enrollment center was so understaffed and "overwhelmed" that hundreds of calls and

66

faxes were dropped, unanswered, or never received.  As Davis admitted after the Class Period,

K12 "didn't have the correct staffing model" at its enrollment centers, and thus "just didn't have

enough people and enough process in place to" convert applications into student enrollments for

the 2013-2014 school year.  Indeed, Defendants admitted that "where the process broke down

was in converting those applications to enrollments" because K12 made "serious missteps

[throughout the] enrollment season."   In short, all of these undisclosed changes were

"significant interruption[s]" that caused a substantial decline in K12's rate of conversion of

applications to new enrollments throughout the Class Period, lower student enrollments at

Managed Public Schools in the 2013-2014 school year, and extremely disappointing financial

outlook for fiscal 2014 as announced on the last day of the Class Period.

### E.    The August 29, 2013 Conference Call

170.    In connection with the filing of the 2013 Form 10-K, on August 29, 2013, at 7:30

A.M. Eastern Time, K12 held an earnings conference call.  On the call, Defendant Packard

stated that the Company's execution to date "allow[s] us to *remain sanguine that fiscal 2014 is*

*shaping up to be an excellent year*."

171.    Defendant Davis also highlighted on the August 29 call K12's purportedly

effective marketing efforts to capture new enrollments, stating that "*we [K12] have a significant*

*marketing effort going on right now to try to capture many of these new enrollments*,

particularly in spaces like Michigan and Texas and in Florida."  He added that "it would be

wrong of me to try to project that we're going to accelerate enrollment growth on the basis of

those things.  *I think it is going to allow us to stay on track from where we were*."

172.    Critically, during the August 29 call, Defendant Rhyu endorsed analysts'

consensus estimates for K12's fiscal 2014 financial guidance – including estimated revenues of

$986.8 million (indicating 16.3% growth).   Specifically, Rhyu stated: "[W]e are comfortable with the fiscal 2014 estimates posted to First Call through yesterday as follows – revenue of $986.8 million; EBITDA of $133.5 million; EBIT of $62.8 million, net income of $36.2 million; and EPS of $0.95 a share."

173.   Defendants' statements were materially false and misleading.   Contrary to Defendants' reassurances about fiscal 2014 "shaping up to be an excellent year" with estimated revenue guidance of $986.8 million and "significant marketing efforts" that would allow K12 to stay "on track" with its estimated financial projections, K12's enrollment operations were a disaster, and its revenue growth prospects had grown increasingly grim.   The Company had implemented undisclosed sweeping changes that drove K12's enrollment call center to be understaffed and "overwhelmed" throughout the Class Period, as admitted by Defendant Davis on October 10, 2013.   As further reported by CWs, K12's enrollment center was so understaffed and "overwhelmed" that hundreds of calls and faxes were dropped, unanswered, or never received – precluding them from adding to the Company's bottom line in fiscal 2014.   As Davis admitted after the Class Period, K12 "didn't have the correct staffing model" at its enrollment centers, and thus "just didn't have enough people and enough process in place to" convert applications into student enrollments for the 2013-2014 school year – no matter how many applications were received.   Indeed, Defendants admitted that "where the process broke down was in converting those applications to enrollments" because K12 made "serious missteps [throughout the] enrollment season."   Moreover, it was well understood by the Officer Defendants that K12's "significant marketing efforts" at that time were too late to generate real enrollments in time for the 2013-2014 school year, and thus would not help K12 to stay "on track" with the analyst consensus estimates that Rhyu endorsed on the August 29 call.   As Davis

68

admitted on October 10, 2013, K12's belated marketing strategy led first to a 9% decline in applications, and then to a glut in applications too late in the summer for K12's dysfunctional enrollment center to handle.  He also explained that K12's inability to convert applications to enrollments was directly "caused by the fact that [K12's] own promotional program started later than it should have, and drove more leads and applications later in the summer instead of early in the summer," which "shortened the time that [K12] had to help parents with all of the documentation required to complete the enrollment."  Indeed, on November 7, 2013, Murray admitted that K12's "forecast planning and reporting tools . . . simply weren't robust enough" to support the enrollment and financial performance promised on the August 29, 2013 call, which Defendants significantly reduced on the last day of the Class Period, just weeks later.

174.    Defendants' statements on the August 29 call and in the 2013 Form 10-K issued that same day were material to investors.  For instance, numerous analysts interpreted Defendant Rhyu's endorsement of consensus estimates to mean that K12's fiscal 2014 revenues would translate into explosive annual revenue growth of at least 16.3%.  To start, BMO Capital Markets issued a report on August 29 indicating that "Management . . . stated it was comfortable with the following consensus estimates for FY2014: Revenues of $986.8 million, implying 16.3% y/y growth. . . . [So w]e are raising our FY2014 EPS estimate to $0.95 from $0.93."  Similarly, analysts at Wells Fargo Securities issued a report on August 29 noting that "management stated that it was comfortable with current FY2014 consensus analyst estimates posted on First Call."

175.    As a result of Defendants' August 29, 2013 false and misleading statements, the Company's stock price increased by more than *11%* from a closing price of $31.96 on August 28 to a closing price of $35.55 on August 29 – the highest price during the Class Period.

## VII.    LOSS CAUSATION

176.    The market price of K12's publicly traded common stock was artificially inflated by the material misstatements and omissions complained of herein, including the misstatements and omissions about K12's enrollment, marketing, and state documentation compliance practices and their material negative impacts on the Company.

177.    The artificial inflation in K12's stock price was removed when the conditions and facts misstated and omitted by Defendants were revealed to the market.  The information was disseminated through a single corrective disclosure on October 8, 2013 after the close of trading, which revealed the nature and extent of K12's deficient enrollment, marketing, and state documentation compliance practices and their material negative impacts on K12. This disclosure, more particularly described below, reduced the price of K12's publicly traded stock, causing economic injury to Lead Plaintiff and other members of the Class.

178.    On October 8, 2013, after the market closed, K12 announced an enrollment shortfall at the Company's Managed Public Schools for the 2013-2014 school year due to K12's inability to convert student applications into enrollments.  K12 further announced that these deficiencies had a significant adverse impact on the Company's financial performance. Specifically, K12 announced that it expected to report annual fiscal 2014 revenues of between $905 million and $925 million – a far cry from analysts' consensus expectations of $986.8 million, which Rhyu had endorsed weeks earlier on August 29, 2013.

179.    As noted above, financial analysts were surprised and disappointed by Defendants' October 8, 2013 disclosure.  For instance, on October 9, 2013, Morgan Stanley reported that K12's "miss on fall enrollments drives a disappointing F14 outlook. . . .  [O]n August 29 it highlighted its comfort with consensus estimates. . . .    Yesterday's

preannouncement is well below these figures and is attributed to weak conversion trends at enrollment centers." The next day, Wells Fargo issued a report stating that, "[o]n [the] Thursday [October 10, 2013 call to discuss K12's announcement], management will likely be asked in particular to explain how the end enrollment result could differ so materially from expectations it articulated on a[n] [August 29, 2013] investor call."

180. As a result of this disclosure, the price of K12's stock plummeted by more than 38% in one day – from a closing price of $28.59 on October 8, 2013 to a closing price of $17.60 on October 9, 2013, with historic trading volume of more than 5.3 million K12 shares traded.

181. Indeed, the Company's October 8, 2013 disclosure was so surprising that it was widely carried by broad news media. For example, after K12 issued the October 8, 2013 press release, *The Washington Post* reported on October 14, 2013 that "K12 underachieves," explaining that K12 was "getting schooled by naysayers" as "shares . . . slipped last week after an uninspiring roll call." This article further reported that the "soft showing finds K12 now targeting between $905 million and $925 million in revenue for the fiscal year that ends next June, well below the $988 million that Wall Street was expecting."

182. Accordingly, the decline in K12's stock price was a direct and proximate result of Defendants' scheme being revealed to investors and the market. The timing and magnitude of K12's stock price decline negates any inference that the economic losses and damages suffered by Lead Plaintiff and the other members of the Class were caused by changed market conditions, macroeconomic factors, or even Company-specific facts unrelated to Defendants' fraudulent conduct.

## VIII.   THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

183.    The statutory safe harbor applicable to forward-looking statements under certain circumstances does not apply to any of the false or misleading statements pleaded in this Complaint.    Many of the statements complained of herein were historical statements or statements of current facts and conditions at the time the statements were made.  Further, to the extent that any of the false or misleading statements alleged herein can be construed as forward-looking, the statements were not accompanied by any meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.  For example, the only cautionary language in K12's SEC filings regarding the enrollment process was generic.  Such disclosures included boilerplate statements, for instance: (1) "If we fail to remain profitable, achieve further marketplace acceptance for our products and services, or fail to enroll or reenroll a sufficient number of students, our business, financial condition and results of operations will be adversely affected"; and (2) "Any significant interruption in the operations of our enrollment centers *could* disrupt our ability to recommend educational options to parents, respond to service requests and process enrollments."  These disclosures were themselves materially false and misleading for their portrayal of the stated risk as a possibility that may or "could" occur, when in reality such events had already occurred and were undisclosed by Defendants.

184.    Alternatively, to the extent the statutory safe harbor otherwise would apply to any forward-looking statements pleaded herein, Defendants are liable for those false and misleading forward-looking statements because at the time each of those statements was made, the speakers knew the statement was false or misleading, or the statement was authorized or

approved by an executive officer of K12 who knew that the statement was materially false or misleading when made.

## IX.     THE PRESUMPTION OF RELIANCE

185.    Lead Plaintiff is entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact which there was a duty to disclose.

186.    Lead Plaintiff is also entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market doctrine because, during the Class Period:

(a)     K12's common stock was actively traded in an efficient market on the NYSE;

(b)     K12's common stock traded at high weekly volumes;

(c)     As a regulated issuer, K12 filed periodic public reports with the SEC;

(d)     K12 was eligible to file registration statements with the SEC on Form S-3;

(e)     K12 regularly communicated with public investors by means of established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services;

(f)     The market reacted promptly to public information disseminated by K12;

(g)     K12 securities were covered by numerous securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective firms.  Each of these reports was publicly available and entered the public marketplace;

(h)     The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of K12 securities; and

(i)     Without knowledge of the misrepresented or omitted material facts alleged herein, Lead Plaintiff and other members of the Class purchased or acquired K12

common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed.

187. Accordingly, Lead Plaintiff and other members of the Class relied, and are entitled to have relied, upon the integrity of the market prices for K12's common stock, and are entitled to a presumption of reliance on Defendants' materially false and misleading statements and omissions during the Class Period.

## X.   CLASS ACTION ALLEGATIONS

188. Lead Plaintiff brings this action as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a Class consisting of all persons and entities who purchased or otherwise acquired the common stock issued by K12 during the period from February 5, 2013 through October 8, 2013, and who were damaged thereby. Excluded from the Class are Defendants; K12's affiliates and subsidiaries; the officers and directors of K12 and its subsidiaries and affiliates at all relevant times; members of the immediate family of any excluded person; heirs, successors, and assigns of any excluded person or entity; and any entity in which any excluded person has or had a controlling interest.

189. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, K12 common shares were actively traded on the NYSE. As of April 24, 2014, K12 reported that it had 39,553,049 shares of common stock outstanding. Although the exact number of Class members is unknown to Lead Plaintiff at this time, Lead Plaintiff believes that there are at least thousands of members of the proposed Class. Members of the Class can be identified from records maintained by K12 or its transfer agent(s), and may be notified of the pendency of this action by publication using a form of notice similar to that customarily used in securities class actions.

74

190.    Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class were similarly damaged by Defendants' conduct as complained of herein.

191.    Common questions of law and fact exist to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of fact and law common to the Class are:

(a)    whether Defendants' misrepresentations and omissions as alleged herein violated the federal securities laws;

(b)    whether Defendants' misrepresentations and omissions as alleged herein misrepresented material facts about K12's operations and prospects during the Class Period;

(c)    whether the Officer Defendants are personally liable for the alleged misrepresentations and omissions described herein;

(d)    whether Defendants' misrepresentations and omissions as alleged herein caused the Class members to suffer a compensable loss; and

(e)    whether the members of the Class have sustained damages, and the proper measure of damages.

192.    Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class actions and securities litigation.  Lead Plaintiff has no interest that conflicts with the interests of the Class.

193.    A class action is superior to all other available methods for the fair and efficient adjudication of this action.  Joinder of all Class members is impracticable.  Additionally, the damage suffered by some individual Class members may be small relative to the burden and expense of individual litigation, making it practically impossible for such members to redress individually the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

194.    The names and addresses of those persons and entities that purchased or acquired K12's common stock during the Class Period are available from the Company's transfer agent(s). Notice may be provided to such purchasers and record owners via first-class mail using techniques and a form of notice similar to those customarily used in securities class actions.

## XI.    CAUSES OF ACTION

### COUNT I

**FOR VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT
AND RULE 10b-5 PROMULGATED THEREUNDER
(Against All Defendants)**

195.    Lead Plaintiff repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

196.    During the Class Period, Defendants K12, Davis, Packard, Murray, Hawks, and Rhyu carried out a plan, scheme and course of conduct which was intended to, and throughout the Class Period, did: (i) deceive the investing public regarding K12's business, operations and management and the intrinsic value of K12 securities; (ii) enabled Defendants to artificially inflate the price of K12 securities; (iii) enabled Packard to sell almost $6.4 million of his privately held K12 shares during the Class Period while in possession of material adverse non-public information about the Company; and (iv) caused Lead Plaintiff and other members of the Class to purchase K12 securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants jointly and individually (and each of them) took the actions set forth herein.

197.    The Defendants named in this count: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material

76

facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon the purchasers of the Company's securities during the Class Period in an effort to maintain artificially high market prices for K12 securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.   The Defendants named in this count are sued as primary participants in the wrongful and illegal conduct charged herein.  The Officer Defendants are also sued as controlling persons as alleged below.

198.    These Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of K12 as specified herein.

199.    These Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of K12's value and performance and continued substantial growth, which included the making of, and the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about K12 and its business operations and future prospects in light of the circumstances in which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of K12 common stock during the Class Period.

200.    These Defendants are liable for all of the materially false and misleading statements and omissions made during the Class Period in the Company's SEC filings, as

alleged above.   K12 is liable for the false and misleading statements made by the Officer Defendants during conference calls with investors and analysts as the maker of such statements and under the principle of respondeat superior.

201.    Defendants Davis, Packard, Murray, Hawks, and Rhyu, as the most senior officers of the Company, are liable as direct participants in the wrongs complained of herein. Through their high-ranking positions of control and authority as the most senior executive officers of the Company, each of these Defendants was able to control, and did directly control, the content of the public statements disseminated by K12.   Defendants Davis, Packard, Murray, Hawks, and Rhyu had direct involvement in the daily business of the Company and participated in the preparation and dissemination of K12's materially false and misleading statements set forth above.

202.    Defendant Packard profited from making these false and misleading statements and omissions through his insider stock sales of K12 stock at artificially inflated stock prices: Packard's gross proceeds during the Class Period were more than $6.4 million.

203.    The allegations in this Complaint establish a strong inference that Defendants K12, Davis, Packard, Murray, Hawks, and Rhyu, acted with scienter throughout the Class Period in that they had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts.  As demonstrated by Defendants' material misstatements and omissions throughout the Class Period, if Defendants did not have actual knowledge of the misrepresentations and omissions alleged herein, they were reckless in failing to obtain such knowledge by recklessly refraining from taking those steps necessary to discover whether their statements were false or misleading, even though such facts were available to them.

78

Specifically, Defendants knew or recklessly disregarded that K12 was suffering from material deficiencies in the Company's application, enrollment, marketing, and state documentation compliance practices, as described more fully above.

204.   Lead Plaintiff and the other members of the Class have suffered damages in that, in direct reliance on the integrity of the market in which the securities trade and/or the materially false and misleading statements and omissions made by Defendants, they paid artificially inflated prices for K12 common stock, which inflation was removed from the stock when the true facts became known.  Lead Plaintiff and the other members of the Class would not have purchased K12 common stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by Defendants' misleading statements.

205.   By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

206.   As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of K12 securities during the Class Period.

## COUNT II

**FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT**
**(Against The Officer Defendants)**

207.   Lead Plaintiff repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

208.   Defendants Davis, Packard, Murray, Hawks, and Rhyu acted as controlling persons of K12 within the meaning of Section 20(a) of the Exchange Act, as alleged herein.

209.    By reason of their high-level positions of control and authority as the Company's most senior officers and, in the case of Packard also as a K12 Director, the Officer Defendants had the power and authority to influence and control, and did influence and control, the decision-making and activities of the Company and its employees, and to cause the Company to engage in the wrongful conduct complained of herein.  The Officer Defendants were able to and did influence and control, directly and indirectly, the content and dissemination of the public statements made by K12 during the Class Period, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.  The Officer Defendants were provided with or had unlimited access to copies of the Company's press releases, public filings and other statements alleged by Lead Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

210.    In their capacities as K12's most senior corporate officers, and as more fully described above, Officer Defendants Davis, Packard, Murray, Hawks, and Rhyu had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities law violations as alleged herein.  The Officer Defendants signed K12's SEC filings and Sarbanes-Oxley certifications, and were directly involved in providing false information and certifying and/or approving the false statements disseminated by K12 during the Class Period.

211.    By virtue of their positions as controlling persons of K12 and as a result of their own aforementioned conduct, Defendants Davis, Packard, Murray, Hawks, and Rhyu, together and individually, are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally

with, and to the same extent as the Company is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT III

### FOR VIOLATIONS OF SECTION 20A OF THE EXCHANGE ACT
### (Against Defendant Packard)

212.    Lead Plaintiff repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

213.    This claim is asserted pursuant to Section 20A of the Exchange Act against Defendant Packard by the Oklahoma Firefighters on behalf of itself and other Class members who purchased shares of K12 common stock contemporaneously with the sale of K12 common stock by Defendant Packard while he was in possession of material, non-public information as alleged herein, and therefore violated Exchange Act Section 10(b) for the reasons stated in Count One above.

214.    Contemporaneously with Defendant Packard insider sales of K12 common stock on July 15-17, 2013 and August 28-29, 2013, the Oklahoma Firefighters purchased shares of K12 common stock on the NYSE while Defendant Packard was in possession of material, non-public information concerning K12's operations and prospects.

215.    Other Class members also purchased shares of K12 common stock contemporaneously with Defendant Packard's insider sales of K12 common stock, including on July 15-17, 2013 and August 28-29, 2013.

216.    The Oklahoma Firefighters and other members of the Class have been damaged as a result of the violations of the Exchange Act alleged herein, because they (i) have suffered substantial damages in that they paid artificially inflated prices for K12 common stock as a

81

result of Defendants' violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder; and (ii) would not have purchased K12 common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially inflated and/or distorted by Defendants' material misrepresentations and omissions.

217.    By reason of his violation of the Exchange Act alleged herein, Defendant Packard is liable to the Oklahoma Firefighters and other members of the Class who purchased shares of K12 common stock contemporaneously with Defendant Packard's sales of K12 common stock during the Class Period.

218.    The Oklahoma Firefighters and the other members of the Class who purchased contemporaneously with Defendant Packard's K12 stock sales seek disgorgement of profits gained (or losses avoided) from Defendant Packard's transactions in K12 common stock contemporaneous with the Oklahoma Firefighters and other members of the Class.

219.    This action was brought within five years after the date of the last transaction that is the subject of Defendant Packard's violation of Section 20A, and, with respect to the underlying violations of Section 10(b) of the Exchange Act alleged in Count One above, was brought within five years after the date of the last transaction that violated section 20A of the Exchange Act by Defendant Packard.

## XII.    PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for relief and judgment as follows:

(a)    Declaring that this action is a proper class action and certifying Lead Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of

Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Lead Plaintiff and the other members of the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

(d)     Awarding disgorgement of profits gained (or losses avoided) from Defendant Packard's K12 stock sales subject to Section 20A;

(e)     Awarding such other and further relief as the Court may deem just and proper.

## XIII.  JURY DEMAND

Lead Plaintiff hereby demands a trial by jury of all issues so triable.

Dated:  May 23, 2014                      **COHEN MILSTEIN SELLERS
                                            & TOLL PLLC**

                                          */s/ Elizabeth Aniskevich*
                                          Steven J. Toll (Va. Bar No. 15300)
                                          Daniel S. Sommers
                                          Elizabeth Aniskevich (Va. Bar No. 81809)
                                          1100 New York Ave., N.W.
                                          Suite 500, East Tower
                                          Washington, D.C.  20005-3965
                                          Telephone:  (202) 408-4600
                                          Facsimile:  (202) 408-4699
                                          stoll@cohenmilstein.com
                                          dsommers@cohenmilstein.com
                                          eaniskevich@cohenmilstein.com

                                          *Local Counsel For Lead Plaintiff
                                          Oklahoma Firefighters Pension & Retirement
                                          System*

                                          **BERNSTEIN LITOWITZ BERGER
                                            & GROSSMANN LLP**
                                          James Harrod
                                          Adam Wierzbowski
                                          Stefanie J. Sundel
                                          1285 Avenue of the Americas, 38th Floor
                                          New York, NY 10019
                                          Telephone: (212) 554-1400
                                          Facsimile:  (212) 554-1444

jim.harrod@blbglaw.com
adam@blbglaw.com
stefanie.sundel@blbglaw.com

*Lead Counsel For Lead Plaintiff Oklahoma*
*Firefighters Pension & Retirement System*

**CERTIFICATE OF SERVICE**

This is to certify that on this date, I electronically filed the foregoing AMENDED CLASS ACTION COMPLAINT with the Clerk of Court using the CM/ECF system, which will automatically send email notification of such filing upon Counsel of Record.

This 23rd day of May 2014

/s/ Elizabeth A. Aniskevich
Elizabeth A. Aniskevich
Va. Bar. No. 81809
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Avenue NW
Suite 500, East Tower
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699

# **<u>Appendix A</u>**

**Confidential Witness Appendix[1]**

| CW No. | K12 Position & Tenure | K12 Job Description |
|--------|----------------------|--------------------|
| CW1 | Enrollment Manager (October 2009 – June 2013)  Sales & Enrollment Queue Lead (July 2008 – October 2009) | CW1 worked at K12's corporate headquarters and was responsible for a team of 96 Enrollment Consultants at K12 – who managed the enrollment process, including call center and student application processing – for Managed Public Schools in Arizona, Colorado, Idaho, Kansas, Michigan, Nevada, Oklahoma, and Pennsylvania, among other states.  CW1 was also responsible for liaising between K12 and the heads of Managed Public Schools.  CW1 reported directly to K12's Senior Director of Enrollment, Aspacia Karageorge. |
| CW2 | Enrollment Consultant (June 2010 – November 2013) | CW2 worked at K12's corporate headquarters and was responsible for enrollment document processing and liaising with prospective students' families interested in K12's Managed Public Schools.  CW2 also served as a primary contact for K12's inbound and outbound enrollment call center communications.  CW2 reported directly to Danny Nguyen, a K12 Enrollment Team Leader, who reported to Donnie Guthrie, a K12 Enrollment Operations Manager. |
| CW3 | Director of Social Media Marketing (September 2008 – November 2013)  Senior Project Manager, Retention & Corporate Marketing (November 2006 – October 2008) | CW3 worked at K12's corporate headquarters and was responsible for the Company's overall marketing strategy, specializing in digital and social media.  CW3 reported directly to Ben Scandlen, K12's Vice President of Digital Marketing. |

---

[1] The information contained in this Appendix is based on information provided by each Confidential Witness to Lead Plaintiff's counsel.

| CW No. | K12 Position & Tenure | K12 Job Description |
|--------|----------------------|--------------------|
| CW4 | State Enrollment Consultant (April 2012 – June 2013) | CW4 worked at K12's corporate headquarters and was responsible for the enrollment approval process, including student application processing for K12's Managed Public Schools.<br><br>CW4 reported directly to Jennifer Jackson, a K12 Enrollment Operations Manager, and Julian Thomas, a K12 Enrollment Team Leader, who reported to CW1. |
| CW5 | State Enrollment Consultant/ Personal Admission Liaison (August 2012 – October 2013) | CW5 worked at K12's corporate headquarters and was responsible for the enrollment approval process, including student application processing and liaising with prospective students' families interested in K12's Managed Public Schools in South Carolina, Texas, Washington D.C., and Virginia, among other states.<br><br>CW5 reported directly to Bobby Merchant, a K12 Enrollment Manager, and Julian Thomas, a K12 Enrollment Team Leader. |
| CW6 | Enrollment Consultant (April 2011-April 2014) | CW6 worked at K12's corporate headquarters and was responsible for enrollment document processing and liaising with prospective students' families interested in K12's Managed Public Schools in Idaho, Minnesota, Nevada, and Wisconsin, among other states.  CW6 also joined a specialized team during the Class Period responsible for the latter stages of the enrollment process.<br><br>CW6 reported directly to Christina Dunham, a K12 Enrollment Supervisor. |

| CW No. | K12 Position & Tenure | K12 Job Description |
|--------|----------------------|--------------------|
| CW7 | Admissions Counselor (April 2013 – October 2013) | CW7 worked at K12's corporate headquarters and was responsible for the enrollment approval process, including student application processing for K12's Managed Public Schools and liaising with prospective students' families interested in K12's Managed Public Schools – especially in Illinois and Texas.  CW7 was also primarily responsible for inbound and outbound enrollment center communications.<br><br>CW7 reported directly to Nick Brisky, a K12 Enrollment Supervisor. |
| CW8 | Enrollment Consultant (April 2012- November 2013) | CW8 was responsible for enrollment document processing and liaising with prospective students' families interested in K12's Managed Public Schools.<br><br>CW8 reported to Bobby Merchant, a K12 Enrollment Manager. |
| CW9 | Michigan Virtual Charter Academy Enrollment Coordinator/ Officer Manager (August 2010 – September 2013) | CW9 worked at K12's Michigan Virtual Charter Academy ("MVCA") in Michigan and was responsible for coordinating MVCA enrollments with K12's enrollment center at Company headquarters.  CW9 also performed various administrative functions at MVCA.  CW9 routinely attended remote weekly meetings with the K12 enrollment team at Company headquarters. |