IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

OKLAHOMA FIREFIGHTERS PENSION  )
& RETIREMENT SYSTEM, Individually   )
And On Behalf of All Others       )
Similarly Situated,              )
                                 )
              Plaintiff,       )
                                 )
      v.                        )       Civil Action No. 1:14-cv-108 (AJT/JFA)
                                 )
K12, INC., *et al*.,               )       <u>CLASS ACTION</u>
                                 )
          Defendants.     )
_____)

<u>**MEMORANDUM OPINION**</u>

     Defendant K12, Inc. ("K12") is a publicly traded company that provides online classroom

services.  In this securities class action, plaintiff Oklahoma Firefighters Pension & Retirement

System ("plaintiff"), a public pension fund, purchased K12's common stock, whose stock price

declined by nearly 40% on October 9, 2013, following K12's announcement of the results of its

Fall 2013 enrollment season.   Bringing this action on behalf of all purchasers of K12 stock from

February 5, 2013 through October 8, 2013 (the "Class Period"), plaintiff alleges that K12 and

certain of its officers (collectively "K12" or "defendants") violated Section 10(b), 20(a) and 20A

of the Securities Exchange Act of 1934 ("the Exchange Act") when they made a series of false or

misleading statements during the Class Period during several investors' conference calls and in

K12's 2013 10-K annual report. [1] Defendants filed their Motion to Dismiss [Doc. No. 39] (the

_____

[1] In addition to K12, defendants include the following, as identified in the Amended Complaint:
Ronald J. Packard, the Founder, CEO and member of the Board of Directors; Nathanial A.
Davis, the Executive Chairman, and member of the Board of Directors; Harry T. Hawks,
Executive Vice President and CFO until his resignation effective May 31, 2013; James J. Rhyu,

"Motion") on June 20, 2014.  The Court heard oral argument on the Motion on August 8, 2014, following which it took the matter under advisement.[2]  For the reasons stated below, the Motion is GRANTED.

## I.  Standard of Review

The sufficiency of plaintiff's complaint is governed by the Private Securities Litigation Reform Act of 1995, Pub. L. No. 104–67, 109 Stat. 737 (the "PSLRA").   Under the PSLRA, plaintiff is required to prove: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874, 884 (4th Cir. 2014) (quoting *Stoneridge Inv. Partners v. Scientific–Atlanta, Inc.*, 552 U.S. 148, 157, 128 S. Ct. 761, 169 L. Ed. 2d 627 (2008)).

A statement constitutes a "misrepresentation" if it either (1) is materially false or (2) contains an omission that renders the statement materially misleading.  *Longman v. Food Lion, Inc.*, 197 F.3d 675, 682 (4th Cir. 1999).  "[A] fact stated or omitted is material if there is a substantial likelihood that a reasonable purchaser or seller of a security (1) would consider the fact important in deciding whether to buy or sell the security or (2) would have viewed the total mix of information made available to be significantly altered by disclosure of the fact."  *Id*. at 683.  The materiality of an alleged misrepresentation or omission must be considered in the full

---

Executive Vice President and CFO as of June 2013; and Timothy L. Murray, the President and COO.  Amended Complaint, Doc. No. 38 at ¶¶ 26–30.   Plaintiff alleges that in addition to violating Section 10(b) of the Exchange Act (Count I), all of these officer defendants were control persons who violated Section 20(a) of the Exchange Act (Count II), and Packard, trading on material non-public information, violated Section 20A of the Exchange Act (Count III).

[2] Pursuant to the PSLRA, 15 U.S.C. § 78u–4(b)(3)(B), discovery has been stayed pending the Court's decision on the Motion.

context in which it was made.  *Gasner v. Bd. of Supervisors of the Cnty. of Dinwiddie, Va*., 103 F.3d 351, 358 (4th Cir. 1996).  Cautionary language in a document may negate the materiality of an alleged misrepresentation or omission.  *Id*. (citing *In re Donald J. Trump Casino Securities Lit*., 7 F.3d 357, 371 (3d Cir. 1993), *cert. denied*, *Gollomp v. Trump*, 510 U.S. 1178, 114 S. Ct. 1219, 127 L. Ed. 2d 565 (1994)).

Certain statements are legally incapable of satisfying these requirements.  "Forward-looking statements" that are either accompanied by cautionary language, immaterial, or made without actual knowledge of their falsity are statutorily protected under the PSLRA's safe harbor provision.  *See* 15 U.S.C. § 78u–5(c)(1).  Likewise, statements that are commonly referred to as "puffery" are not material as a matter of law.  *In re Lab. Corp. of Am. Holdings Sec. Litig*., No. 1:03cv591, 2006 WL 1367428, at *9 (M.D.N.C. May 18, 2006) ("[S]tatements that consist of nothing more than indefinite statements of corporate optimism, also known as 'puffery,' are immaterial as a matter of law.") (citing *Raab v. Gen. Physics Corp*., 4 F.3d 286, 289 (4th Cir. 1993)); *see also In re Cable & Wireless, PLC, Sec. Litig*., 332 F. Supp. 2d 896, 900 (E.D. Va. 2004) (defining an immaterial statement as "a certain kind of rosy affirmative commonly heard from corporate managers and familiar to the marketplace—loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available").

In order to satisfy the scienter requirement, the plaintiff must also establish that defendants made the false or misleading statements with an "intention to deceive, manipulate, or defraud."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313, 127 S. Ct. 2499 (2007) (citation omitted).  In order to satisfy that requirement, the plaintiff must allege in its complaint facts that show that a defendant had actual

3

knowledge that a forward-looking statement was false at the time it was made.  *See* 15 U.S.C. § 78u-5(c)(1)(B); *In re CIENA Corp. Sec. Litig.*, 99 F. Supp. 2d 650, 660–61 (D. Md. 2000). The "actual knowledge" requirement may be satisfied by a showing of "recklessness."  *Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172, 181 (4th Cir. 2009) ("Pleading recklessness is sufficient to satisfy the scienter requirement.").  A "reckless" act is defined as an act that is "so highly unreasonable and such an extreme departure from the standard of ordinary care as to present a danger of misleading the plaintiff to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it."  *Ottmann v. Hanger Orthopedic Group, Inc.*, 353 F.3d 338, 343 (4th Cir. 2003) (quoting *Phillips v. LCI Intern., Inc.*, 190 F.3d 609, 621 (4th Cir. 1999)).  Overall, in order to satisfy the scienter requirement, the alleged facts must raise a "strong inference" that the required level of scienter accompanying the alleged material misrepresentation is "at least as likely as any plausible opposing inference."  *Matrix Capital* at 181–82 (4th Cir. 2009).[3]

---

[3] The Court in *Matrix Capital* stated:

The PSLRA requires a plaintiff to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2); *Tellabs*, 551 U.S. at 314, 127 S. Ct. 2499. The plaintiff must "plead facts rendering an inference of scienter *at least as likely* as any plausible opposing inference." *Tellabs*, 551 U.S. at 328, 127 S. Ct. 2499 (emphasis in original). According to *Tellabs*, a Rule 12(b)(6) motion to dismiss a § 10(b) action is to be analyzed as follows:
*First*, . . . courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true. . . .
*Second*, courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss.... The inquiry . . . is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard.

4

## II. Analysis[4]

Plaintiff has alleged, and defendants have not disputed, that it purchased K12 stock during the Class Period and suffered a loss as a result of a decrease in K12 stock prices in October 2013. The plaintiff has also alleged with the required particularity the specific statements during the Class Period it relies upon as false or misleading and the facts on which it relies to satisfy its initial pleading burden under the PSLRA.  Those facts fall into two categories: (1) statements made by various defendants after the Class Period in October and November 2013 (the "post-period statements"); and (2) facts set forth in confidential witness statements by certain employees of K12 ("the employee statements").[5]  The Court will therefore analyze the

---

*Third*, in determining whether the pleaded facts give rise to a "strong" inference of scienter, the court must take into account plausible opposing inferences. . . . The strength of an inference cannot be decided in a vacuum. The inquiry is inherently comparative: How likely is it that one conclusion, as compared to others, follows from the underlying facts? . . . [T]he inference of scienter must be more than merely "reasonable" or "permissible"—it must be cogent and compelling, thus strong in light of other explanations. A complaint will survive, we hold, only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.
*Tellabs*, 551 U.S. at 322–24, 127 S. Ct. 2499. "In sum, the reviewing court must ask: When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *Id*. at 326, 127 S. Ct. 2499.
Moreover, "corporate liability derives from the actions of its agents." *Teachers' Retirement Sys of LA v. Hunter*, 477 F.3d 162, 184 (4th Cir. 2007). To the extent a plaintiff alleges corporate fraud, the plaintiff "must allege facts that support a strong inference of scienter with respect to at least one authorized agent of the corporation." *Id*. (emphasis original)

[4] It appears from the filings that K12 had a fiscal year beginning July 1, with the first quarter ("Q1") running from July 1 through September; the second quarter ("Q2"), from October 1through December; the third quarter ("Q3"), from January 1 through March; and the fourth quarter ("Q4"), from April1 through June.  *See, e.g.*, Doc. Nos. 40-4, 40-5.

[5] The employee statements appear in the Amended Complaint and in Appendix A to the Amended Complaint.  *See* Doc. No. 38 at 90.  The information contained in these statements is based on information provided by confidential witnesses to lead plaintiff's counsel.  *Id.*

sufficiency of the Amended Complaint as to each of these alleged misstatements, quoted below

in context, in light of the facts alleged and the demanding pleading standards of the PSLRA.

*See Matrix Capital*, 576 F.3d at 182; *Gasner*, 103 F.3d at 358 ("The alleged misrepresentations

and omission relied upon by appellants must be considered in the full context in which they were

made.").

### A. February 5, 2013 Statements

During an earnings conference call on February 5, 2013, defendant Murray made the

following statements:

> 1. [A]s we rolled out our initial plan for this year[,] [w]e . . . focus[ed] on
> marketing to states that had a higher funding rate. We have invested in some of
> the systems and the tools and the processes to affect the revenue capture rates.

Doc. Nos. 38 ¶ 137; 40-1 at 1.

Plaintiff claims that this statement was false or misleading when made because in post-

period comments, defendant Davis admitted that K12's promotional marketing program "started

later than it should have."  Doc. Nos. 38 ¶ 138; 40-6 at 3.  Plaintiff claims K12 did not target its

marketing at states with higher funding rates, but instead "embarked on a new, national

marketing campaign," as alleged in employee statements.  Doc. No. 38 at ¶¶ 46, 138.  First, it

appears that Murray's alleged misstatement, made during Q3 of FY13, was referring to the

marketing plan for FY13, which began on July 1, 2012, while Davis' post-period statement

refers to the marketing effort for FY14.  In any event, none of these relied upon comments raises

a sufficient inference that K12 was not "focused on marketing to states with higher funding

rates" when K12 "rolled out our plan for this year" or that the marketing plan had not been

"rolled out" by February 5, 2013, as Murray stated.  Likewise, neither Davis' post-period

comments nor the employee statements allow any reasonable inference that Murray possessed

the required degree of scienter.

2. As you look at areas like our materials costs, that is a large segment of our income statement. As you look at marketing enrollment costs, those are large segments of our income statement. And so we're clearly focused on where the dollars are, and we're focused on what we can do to improve unit cost efficiencies.

Doc. Nos. 38 ¶ 137; 40-1 at 1.

Based on post-period statements, plaintiff contends that it was false or misleading for Murray to say that K12 was "focused on where the dollars are," and "focused on what [it could] do to improve unit cost efficiencies."  Doc. No. 38 ¶ 138.  In particular, plaintiff argues that, in light of post-period statements that K12's marketing plan was belatedly rolled out and "national" and that K12 "spent too many hours in the wrong states," K12 necessarily did not "focus" its efforts as stated.  *Id*.  Again, it appears that Murray's February 2013 statements are directed to the marketing effort for FY13, whereas Murray and Davis' post-period comments are directed to the marketing effort for FY14.  In any event, the post-period comments do not conflict with Murray's February 5, 2013 statements, even if those were directed to the FY14 marketing effort. At most, his post-period comments suggest that, in hindsight, K12 realized that its marketing activities were not done in the most effective manner.  They do not allow the inference that the February 5, 2013 statements were false or misleading or that Murray had the required degree of scienter.

3. K12 "implemented click-to-call functionality on our mobile advertising pages, driving higher call volumes to our enrollment center, where we typically see conversion rates that are generally double that of Web forms."

Doc. Nos. 38 ¶ 139; 40-1 at 2.

Plaintiff contends it was false and misleading for Murray to represent that "higher call volumes to [K12's] enrollment center" could drive higher conversion rates because K12's

enrollment center was "overwhelmed" throughout the Class Period.  Doc. No. 38 ¶ 140.

Specifically, plaintiff relies on Murray's post-period statements that "where the process broke

down was in converting those applications to enrollments" because K12 made "serious missteps

[throughout the] enrollment season" and its "forecast planning and reporting tools . . . simply

weren't robust enough" to administer K12's enrollment process.  *Id.* ¶ 140.  Plaintiff also

presents employee statements recalling that, prior to 2013, employees typically handled an

applicant through the entire enrollment process, which led to "consistent communications" and

"higher conversion rates," but in Q1 (July–September) FY14, K12 reorganized the operations of

the enrollment center, such that different employees handled different stages of the process for a

particular applicant and  "days or weeks would pass" between when an application was

submitted and when an employee contacted the family to start the enrollment process.  *See id.*

¶¶ 57, 140.

 For the reasons mentioned as to Murray's other February 5, 2013 statements, nothing in

these relied upon post-period statements or cited employee statements is sufficient to raise the

required inference that this Class Period statement was factually incorrect, otherwise misleading,

or stated with the required degree of scienter.

### B. March 11, 2013 Statements

Plaintiff relies upon the following statements, presented in context, made by defendant

Packard on March 11, 2013 at the Credit Suisse Global Services industry conference:

> 1. We know how to manage schools. We know how to manage relationships
> with school districts, with states. We continually innovate new products and
> services. We've invented or brought out a lot of hybrid schools now where
> kids go to school one day a week, two days a week. So we continue to
> innovate new educational models and products. And we've learned how to
> market to the consumers. So we take these core competencies and we look at,
> are there other businesses with those – within the education space that those
> core competencies can give us a sustainable competitive advantage.

Doc. Nos. 38 ¶ 143; 40-1 at 2.

Plaintiff has not presented facts from which it can be inferred that any of Packard's

opinions regarding the various strengths of K12 were false or misleading or that Packard had the

required scienter.  *See Ottmann v. Hanger Orthopedic Grp., Inc.*, 353 F.3d 338, 342–43 (4th Cir.

2003) (stating that to allege a misrepresentation or omission of material fact, a plaintiff "must

point to a factual statement or omission—that is, *one that is demonstrable as being true or*

*false*") (emphasis added) (internal quotation marks omitted).  There are no misstated facts; and

the statements are, in substance, only non-actionable opinions.

> 2. Our customer satisfaction is extremely high. It has been since the very
> beginning. And because of that despite all of the sophisticated things we do with
> regard to recruiting students, our number one source of new students is referrals
> from existing students. And really that's frankly all I need to say about our
> business is if you have a product and service that's so compelling that people are
> referring it to others, that's about all you really need to know.
> …
> Last point is we operate in a highly, highly regulated environment. Our schools
> are operating under 34 different states, auditing regimes with different rules and
> regulations, different standards, so we have a great history. I think it's less than
> 0.1% of our enrollments have ever been questioned in terms of the funding and so
> we do an amazing job at this. It's hard to be perfect. So from time to time there
> maybe things but we're audited continuously, what do we have, Harry? 50 audits
> plus going on every year. Every year we get audited more than 50 times. So this is
> a company that takes, very – compliance very seriously and tries to be way above
> the bar because of the scrutiny level we're under but also it's the right thing to do.
> We have states where 25% of the teachers don't have to be certified by charter
> laws, our teachers are 100% certified. So we try to jump way over the bar and
> make sure we comply with every rule and regulation.

Doc. Nos. 38 ¶ 144; 40-1 at 2–4.

Plaintiff challenges Packard's statement that K12 did an "amazing job" ensuring

compliance and K12 "make[s] sure we comply with every rule and regulation" and that

K12 took "compliance very seriously" and used a "sophisticated approach" to ensure

compliance "with every rule and regulation," relying on Davis' post-period statements

that "there were some new compliance requirements that [K12] did not factor in appropriately into [its] capacity planning model." Doc. No. 38 ¶ 145. Plaintiff also relies on employee statements that employees assigned to enrollments had "less familiarity with the individualized compliance requirements for each school" and were "learning as they went along." *Id.* ¶¶ 71, 72, 145.

Again, plaintiff has not identified any misstated facts or presented facts that would allow the inference that on March 11, 2013 Packard falsely stated his opinions and beliefs concerning the company's attitude toward compliance. Whether K12 miscalculated the impact of compliance on the staff time needed to process applications is an issue different than whether K12 identified and satisfied compliance requirements. The relied upon post-period statements speak only to the impact of compliance on application processing times, not whether K12 successfully complied with any compliance requirements. Moreover, the issues identified in post-period comments appear to have arisen after Packard's March 11, 2013 comments and do not allow the required inferences to be drawn with respect to those Class Period statements. The employee statements do not contradict Packard's statements and Packard's statements are the kinds of statements that cannot be objectively demonstrated to be false or misleading. *See In re Constellation Energy Grp., Inc. Sec. Litig.*, 738 F. Supp. 2d 614, 631 (D. Md. 2010) ("general statements about" the defendant's "'strong risk management culture' and 'effective system of internal controls'" were "mere puffery").

3. One of the great things about K12, and at its heart, K12 is a growth company. And it's rare, I think you see a growth company that hasn't really no asymptote in sight. So why do we think that? Well, if you look at the size of U.S. public education market, its $650 billion or it's about 58 million kids. We have 130,000 kids today. So we can grow at a high rate for a long time. And even if you double every three years, which is about 24% growth rate, it's a long time before you can

get to the 2 million home school kids that are out there. And this is a far more attractive value proposition than home schooling. I'd also add that as the kids have come to us, people think, online schooling, it's homeschoolers coming.

The last count, that's about 11% of the students who come in. The other 89% are coming from that brick-and-mortar component. So this is appealing a lot to the kids who are in the brick-and-mortar. So believe that high growth rates can be sustained at K12 for a long time to come because while virtual education will be a niche market, it will never be the majority of these kids, by any stretch. The market is so large that it turns up that the niche is enormous.

Doc. Nos. 38 ¶ 146; 40-1 at 4–5.

Plaintiff contends that it was false or misleading for Packard to say that K12 had such high growth potential.  Doc. No. 38 ¶ 147.  Plaintiff relies on (1) defendant Davis' October 10, 2013 statement that "[d]uring March to June of 2013, [K12] received 9% fewer applications than [it] did during the timeframe one year earlier in 2012[]"; and (2) employee statements that describe declining student applications during the first half of 2013.[6]  *See id.* ¶¶ 42, 45, 147–48. The referenced decline in applications does not allow the inferences that the plaintiff would draw concerning either the material falsity of any relied upon statements or scienter.  There is no information concerning the extent of the decline other than the referenced 9% decline during the period March to June 2013, which would not have been tallied or known to Packard when he made his early March statements.  In any event, the height of the enrollment season is July through September, substantially after Packard's early March 2013 statements, during which in 2013, K12 received 25% more applications as compared to 2012.  There appears to be no dispute

---

[6] These statements variously describe the timing of this decline.  One employee states that the decline started in January 2013 and continued until this employee left the company in June 2013. Doc. No. 38 ¶ 42.  Another refers to a "decline in the number of student applications by no later than the end of April/early May 2013," and a third states that the volume of applications was lower in the spring of 2013 than the previous spring.  *Id.* ¶¶ 42, 45.

that the drop in stock price was not caused by a shortage of applications, but rather by the company's inability to timely process the influx of applications that did occur.

### C. May 3, 2013 Statements

On May 3, 2013, K12 held its Q3 FY13 earnings conference call during which defendants Davis, Hawks, Packard and Murray made the following relied upon statements:

> 1. [Question from Jerry R. Herman:] Just wanted to pursue the fourth quarter a little bit and in the hopes that you might be able to disaggregate some of these fourth quarter, quarter inputs. You mentioned, I guess, sort of timing issues on funding as Item A, the management changes were also mentioned. Ron, you mentioned a marketing spend to increase potentially in the fourth quarter, which I'd like to maybe hopefully get some color on.
>
> [Answer from defendant Nathaniel A. Davis:] And Jerry, Nate Davis speaking here. Just put them in priority order for you. The largest issue of course is the delay in the student reimbursement rate that Harry talked about. The second most important because you want some color on that, was the Institutional business. And third would have been the International and Private Pay. But the first two are really the cause of us looking at – a different set of numbers in the fourth quarter. But we also, I had mentioned that this is actually good news, because our only operational miss or concern for the next quarter is in a revenue stream that accounts for less than 10% of our business, Institutional.
>
> So that means, we're in good shape in managed schools. It's performing as we expected, as a matter of fact better than we expected and that remains our focus for the next few years. So, we're actually pretty proud that we have no concerns in the managed schools area. It's really just some of the work we have to do in the Institutional business.

Doc. Nos. 38 ¶ 151; 40-1 at 5–6.

Plaintiff primarily contends that it was false and misleading to say that K12 was "in good shape" in managed schools and "performing as [] expected, as a matter of fact better than [] expected," again relying on the 9% year-over-year decline in applications for the period March to June 2013. Doc. No. 38 ¶ 153. But, again, a statement such as "in good shape," without evidence that defendants thought otherwise, is not actionable. *See In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010) ("[I]nvestors do not rely

on vague statements of optimism like 'good,' 'well-regarded,' or other feel good monikers."); *cf. Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000) (reasoning "defendants may be liable for misrepresentations of existing facts" where "the defendants stated that the inventory situation was 'in good shape' or 'under control' while they allegedly knew that the contrary was true").  Here, the focus of the discussion was the upcoming Q4 of FY13 (April–June 2013) and there is no complaint that the relied upon statements misrepresented what defendants thought were the prospects for Q4 or that, in fact, the Q4 or FY13 year end results were out of line with expectations.   As Packard stated later in that same presentation, K12 usually ramps up its marketing activity in the fourth quarter for the coming fiscal year, with heavy marketing expenses at that time; and K12 had already confirmed unprecedented cap expansions.

        Plaintiff also asserts it was misleading to state, in effect, that K12 had no concerns with the Managed Public School segment because defendants had to implement sweeping changes in its enrollment center.  *See* Doc. No. 38 ¶¶ 151, 153.  In this regard, plaintiff also points to employee statements that recount employee frustration with K12's "woefully inadequate infrastructure and systems," and the reduction in enrollment staff bonuses that eliminated incentives to secure enrollments.  *Id.* ¶¶ 60, 65.  However, defendants' post-period statements that they had problems with their staffing model and enrollment center  in the July to September 2013 period does not allow the necessary inference that in early May 2013 defendants did not believe that K12 was "in good shape" or not "performing as [] expected, as a matter of fact better than [] expected" for FY13, which ended on June 30, 2013.  Nor are there any facts from which to conclude

that the required level of scienter existed on the part of any defendant as to any relied

upon statement.

> 2. We'd also like to address three questions you may have on your mind regarding our outlook. Number one, why did Q3 turn out better than we thought on February 5? First, enrollment and retention in our core business were better than our internal forecast for the period. Number two, funding and rate realization in our core business were better than our internal forecast as well. Number three, our gross margin was 200 basis points better than we thought on February 5. The foregoing, however, was offset by revenues that were below our expectations in our other businesses.

> Second question you may have, why is the implicit fourth quarter outlook somewhat below, what we thought on February 5. Some revenue we thought that would hit in Q4 was actually realized in Q3. A portion of the funding increases in our core business that were indicated some time ago, and then subsequently included in our forecast have been delayed to a future period. Although, as noted by Ron, this year has seen the realization of significant improvement in the funding environment. We see continued weakness in our Institutional business, potentially resulting in flat year-over-year performance for this group, Internal (*sic*) [International] and Private Pay, while growing is expected to be below our internal expectations, and additional expenses are expected in the fourth quarter associated with management changes and additions.

> Third question you may have; why did we reduce the full-year revenue outlook to the lower half of our previous range? Simply, it was the factors above, particularly though the weakness in institutional and a delay in certain funding increases. However, the underlying fundamentals in the core business remained strong, specifically enrollment, retention, funding environment, and revenue capture.

Doc. Nos. 38 ¶ 152; 40-1 at 6–8.

Plaintiff relies principally on the statement that "…the underlying fundamentals in the

core business remained strong, specifically enrollment, retention, funding environment, and

revenue capture."[7]  *See* Doc. No. 38 ¶ 153.  This statement is nothing more than a summary of

FY13 year-end performance, which plaintiff does not rely on for its claims.  In any event, this

---

[7] Plaintiff initially contended that this statement was actually "… the underlying fundamentals in the core business *remain* strong…."  Doc. No. 38 ¶ 152.  However, the transcript of the conference call shows that Hawks said "remained strong."  Doc. No. 40-9 at 6.

statement is the type of soft statement or puffery that is not actionable under the PSLRA, even

were it intended as a forward-looking statement with respect to FY14.  *See Indiana State Dist.*

*Council of Laborers & Hod Carriers Pension & Welfare Fund v. Omnicare, Inc*., 583 F.3d 935,

943 (6th Cir. 2009) (finding that the statement that "[Defendant's] revenue and earnings growth

outlook remains positive given our strong underlying fundamentals and our proven growth

strategy" was not actionable, as it was a "forward-looking statement[] entitled to safe-harbor

protection").  Plaintiff asserts that numerous employees reported that K12 "lacked adequate

staffing in 2013." Doc. No. 38 ¶¶ 76, 153.  However, these allegations do not contradict any

relied upon Class Period statements or show that defendants were not committed to the core

business fundamentals.  There is also no evidence from which the required inference of scienter

could be drawn.

> 3. I am happy with the additional time I now have to devote to academics and facilitating the delivery of individualized education. I also now have additional time to spend in business development, which I'm enjoying. We're on track to have one of the best business development years in our history. As many of you know, our growth rate can be significantly increased by new schools and expansion of enrollment and caps in cap states.
>
> For the upcoming fall, we have already secured cap expansion of 12,800 additional enrollment slots. This is dramatically larger than anything we have ever experienced previously and amounts to 10% of this year's full-time enrollment in managed schools. Furthermore, we believe there is a strong possibility of additional cap expansion. While there's no guarantee that we'll fill all these slots, the pent-up demand, referral network and existing school infrastructure make these slots easier to fill than slots for students in new states.

Doc. Nos. 38 ¶ 154; 40-1 at 8–9.

These statements not only include significant cautionary language ("…there is no

guarantee that we will fill all of these [enrollment] slots…"), but also lack any demonstrably

false statements with respect to current or historical facts.  As discussed above, a statement such

as K12 is "on track to have one of the best business development years in [its] history" is the

15

type of vague, ambiguous statement that does not justify reliance on the part of investors.
Plaintiff claims it was false for Packard to state that enrollment slots created by cap expansions
were "easier to fill" than slots for students in new states because K12 was suffering from an
inability to convert applications to enrollments across the board.  Doc. No. 38 ¶ 158.  Those
statements, however, do not raise any reasonable inference that any of the relied upon statements
were false or misleading or that K12 had not, in fact, secured an additional 12,800 student
enrollment slots by May 3, 2013.  Moreover, there is no evidence that these statements were
made with the required level of scienter.

> 4. Usually, and historically, when we receive cap expansions, we've actually
> generally gone to a 100% the first year. However, we've never experienced
> anything as large as Michigan, when you're going from 1,000 to 10,000. So, I
> think being at 67% may actually be a reasonable estimate? We don't know,
> because it really is an unprecedented amount of growth in a single year. But we
> would anticipate that obviously Michigan is a big enough state that we could get
> to that 10,000 in year two. But generally, we normally build them up right away,
> because we haven't had, we're usually looking at 2,000 to 3,000 kids at most, not
> 9,000.

Doc. Nos. 38 ¶ 155; 40-1 at 9–10.

Plaintiff relies on (1) K12's internal enrollment goal was only 45-50% of the possible
enrollment level that Packard referenced; (2) K12's actual enrollment in Michigan by September
2013 of 4,700 students, rather than the 6,000-7,000 that Packard thought possible; and
(3) employee statements that "K12 internally understood that 4,500 students" was more realistic
than 6,000 or 7,000.  Doc. No. 38 ¶ 157.  Packard's statements are a prediction and therefore
forward-looking statements.  They also include cautionary language ("We don't know, because it
really is an unprecedented amount of growth in a single year.").  Overall, Packard's statement
simply shows what Packard thought K12 might be able to achieve in Michigan, based on huge
growth potential.  There is no evidence that Packard did not, in fact, believe anything in this

statement or that there was no reason for him to believe something in this statement when he

made it in May 2013.

    5. With this unprecedented cap expansion, the prospects have increased per pupil funding, the continued mainstream of online education, the new state pipeline and the improvements to our offering, we are looking forward to strong fall enrollment and a great 2013-2014 school year.

…

[Question from Jerry R. Herman:] Just wanted to pursue the fourth quarter a little bit and in the hopes that you might be able to disaggregate some of these fourth quarter, quarter inputs. You mentioned, I guess, sort of timing issues on funding as Item A, the management changes were also mentioned. Ron, you mentioned a marketing spend to increase potentially in the fourth quarter, which I'd like to maybe hopefully get some color on…

[Answer from defendant Ronald J. Packard:] I'll start with the marketing spend and the correlation. The way our business works is we end up spending a lot of money in the fourth quarter recruiting students for the next year. So, we incur a lot of expenses that have no revenue impact on this fiscal year. When we go through our guidance and modeling at the beginning of the year, we expect a certain amount of new states and cap expansion. Obviously, this year has exceeded our expectations. And if we have additional cap expansion or additional new state, it would be beyond what we had ever anticipated. So, we would incur significantly higher marketing expense – or higher marketing expenses in the fourth quarter than we had originally planned.

…

[Question from Jeff P. Meuler:] Perfect. And then Ron, obviously kudos on the business development to you and the team, it sounds like there's still some more opportunities that could be live for next school year. At what point of the year or summer, should we think about kind of business development being, I'll call it locked in for next school year where if you're going to get a new state or you're going to get a cap increase, are they kind of in place by July or how should we think about the timing of that?

[Answer from defendant Ronald J. Packard:] For the most part, they're usually in place by July. I would expect the additional cap expansion we're expecting to be in place by July. With new states, it has happened in the past where we actually got final notification as late as the end of August, and could open a school, that's not ideal and it creates a rapid engagement here like you've never seen before. But at the end of the day, I would expect by – certainly by early August everything is wrapped down.

Doc. Nos. 38 ¶ 156; 40-1 at 10–12.

These statements are also forward-looking statements reflecting the speaker's opinions about the potential for business growth and therefore not actionable under the PSLRA, absent any showing that there was no reasonable basis for such statements.  *See In re Int'l Bus. Mach. Corp. Sec. Litig.*, 163 F.3d 102, 109 (2d Cir. 1998) ("An opinion may . . . be actionable . . . if it is without a basis in fact . . . .  [Or if] the speakers were aware of any facts undermining the accuracy of these statements").  *Compare* Doc. Nos. 38 ¶ 156; 40-1 at 10–11 ("[W]e are looking forward to strong fall enrollment and a great 2013-2014 school year."); *with In re Trex Co., Inc. Sec. Litig.*, 454 F. Supp. 2d 560, 576-77 (W.D. Va. 2006) (CEO's statement "that he 'expect[ed]' 20-25% revenue and earnings growth" was not actionable because "expectations are not guarantees").  That showing has not been made on the record before the Court.

Plaintiff takes issue with the statement that "[o]bviously, this year has exceeded our expectations," but that statement is referring to the results of FY13 and "new states and cap expansions" that occurred in FY13, none of which is claimed to be misrepresented; and the facts alleged would not allow in any event the required inferences of either falsity or scienter with respect to that statement.  Finally, Plaintiff relies on Packard's statement that additional cap expansion would take place by July and that "certainly by early August everything is [wrapped] down' in terms of recruiting and enrollment," Doc. Nos. 38 at ¶ 156; 40-1 at 12.[8]  Here, Packard is answering a question concerning when K12 would know with certainty that within a given state, there is a cap expansion or a new school available for enrollments, not when K12's particular

_____

[8] As reflected above, Packard actually said "wrapped down," not ramped down.  *See* Doc. No. 40-1 at 12.

enrollments would be finalized.  There are no facts that would support a claim of falsity

or scienter with respect to his statements.

> 6. Looking at our marketing and enrollment performance, our internally tracked
> in-year withdrawal rate for our managed public schools was down 1.4% compared
> to the prior year quarter. Our cost per acquisition was down 2.6% compared to the
> prior year quarter, aided by the implementation of further SCO improvements and
> more robust display advertising, auditing, and attribution analytics to strengthen
> our marketing signs and improve efficiency and yield. We also began testing in a
> variety of ways to better respond to our families, including extended weekday and
> weekend hours and click to chat. These actions are all indicative of our efforts to
> drive greater operational excellence in our marketing efforts.

Doc. Nos. 38 ¶ 160; Doc. No. 40-1 at 12–13.

Based on post-period statements that K12 started its promotional program later that it

should have and did not react quickly enough to changes that occurred during the enrollment

season to reallocate resources effectively, plaintiff  contends it was false or misleading for

Murray to state that K12 had implemented heightened auditing and market science techniques to

improve "enrollment performance" and had taken steps to achieve and "drive greater operational

excellence in [its] marketing efforts." Doc. Nos. 38 at ¶¶ 16, 161; 40-6 at 3.  Here, Murray's

statements are nothing more than a FY13 year-to-date assessment of performance.   There is no

claim that during FY13 K12 did not, in fact, do anything Murray mentioned or for the purposes

mentioned.  Rather, it contends that these statements were false and misleading in light of K12's

post-period assessment of its experience and performance during the first quarter of FY14.

There is nothing in the post-period statements that allow the required inferences of falsity or

scienter as to Murray's statements made in May 2013.

### D. 2013 Form 10-K Statements

Plaintiff alleges that the following statements found in K12's 2013 Form 10-K,

filed on August 29, 2013, were false or misleading:

> 1. Compliance and Tracking Services. Operating a virtual or blended public school entails most of the compliance and regulatory requirements of a traditional public school. We have developed management systems and processes designed to ensure that schools we serve are in compliance with all applicable requirements, including tracking appropriate student information and meeting various state and federal reporting, record keeping and privacy requirements. For example, we collect enrollment related information, monitor attendance and administer proctored state tests. As we have expanded into new states, our processes have grown increasingly robust. We intend to hire a Chief School Compliance Officer during fiscal year 2014 to supplement and oversee compliance at the local school level.
>
> Software Developed or Obtained for Internal Use. We develop our own proprietary computer software programs to provide specific functionality to support both our unique education offerings and the student and school management services. These programs enable us to develop courses, process student enrollments, meet state documentation requirements, track student academic progress, deliver online courses to students, coordinate and track the delivery of course-specific materials to students and provide teacher support and training. These applications are integral to our learning systems and we continue to enhance existing applications and create new applications. Our customers do not acquire our software or future rights to it.
>
> Doc. Nos. 38 ¶ 165; 40-1 at 13–14.

Plaintiff contends that the statements are misleading because, as it turned out, K12 was unable to process the influx of applications that occurred during the Class Period.  Doc. No. 38 ¶ 166.  However, plaintiff has not alleged any facts that establish or suggest that K12 had not "developed management systems and processes designed to ensure that schools we serve are in compliance with all applicable requirements" or that it had not developed "proprietary computer software programs to provide specific functionality to support both our unique education offerings and the student and school management services."   In fact, the plaintiff does not claim that K12 failed to detect compliance issues or perform the required compliance, but rather that it did not perform the required compliance in a sufficiently timely or efficient manner.  *See id.* There are no representations, as plaintiff implies, that K12's systems had "grown increasingly robust" to ensure that it could timely process all of the applications required to meet its revenue

goals.  Plaintiff relies on employee statements that enrollment specialists assigned to work on

another state during the Class Period were "not given much notice of, or training about, that new

state," "simply learning as they went along," and that K12 was "still hiring and training

employees during the peak of its enrollment season."  *Id.* ¶¶ 72, 77, 166.  However, these

allegations do not make false any of K12's statements that it had developed the described

compliance systems as of August 29, 2013.  Nothing about these statements indicates that K12

knew, at the time the Form 10-K was filed, that anything about these statements was false or

misleading or that any defendant had the required scienter.

> 2. Our primary enrollment center operations are housed in our corporate
> headquarters. To mitigate operating risk in certain high volume queues, we have
> the ability to reroute calls to other facilities if a certain facility is unable to
> temporarily service calls. This plan may not be able to prevent a significant
> interruption in the operation of any of the facilities due to natural disasters,
> accidents, failures of our fulfillment provider. However, we have the ability to
> respond to a service interruption to lessen its impact on customers. Any
> significant interruption in the operation of any primary facility, including an
> interruption caused by our failure to successfully expand or upgrade our systems
> or to manage these expansions or upgrades, could reduce our ability to respond to
> service requests, receive and process orders and provide products and services,
> which could result in lost and cancelled sales, and damage to our brand
> reputation.

Doc. Nos. 38 ¶ 167; 40-1 at 15.

Plaintiff claims that the representation that K12 had "the ability to reroute calls" is false

or misleading because employee statements revealed that K12 had a "number of phone and fax

problems" that "prevented K12 from converting applications to enrollments" and Davis made a

post-period statement that K12's model failed because the call center was "overwhelmed" by the

volume of calls. Doc. No. 38 ¶¶ 59, 168; *see also* Doc. No. 40-6 at 5.  With respect to the

capabilities discussed in the statement, there are no allegations that the enrollment center did not,

in fact, have the ability to reroute calls to other facilities or lessen the impact of significant

interruptions on its customers.  The allegations that the call center was overwhelmed do not

make the relied upon statements false or misleading; and there are no facts alleged sufficient to

establish the required scienter.

### E. August 29, 2013 Statements

Finally, plaintiff alleges the following three statements from the August 29, 2013 call as

being false or misleading.

> 1.  The prospect of increased funding, unprecedented cap expansion and the
> continued mainstream of online education allow us to remain sanguine that fiscal
> 2014 is shaping up to be an excellent year and a solid growth foundation is being
> built for the next fiscal year.

Doc. Nos. 38 ¶ 170; 40-1 at 16.

Plaintiff does not contend that there did not exist "increased funding, unprecedented cap

expansion and the continued mainstream of online education" or that "a solid growth foundation

is being built for the next fiscal year [FY15]."  And the statement that defendants are "sanguine"

that FY14 is "shaping up to be an excellent year" is the kind of forward-looking opinion that is

not actionable under the PSLRA.

> 2. And what you're asking is a question that requires us to project that we're
> going to be better than some of the estimates out there. I think we ought to be
> smart and cautious right now and say the answer to that question would be no.
> That doesn't mean we're not working on it. I mean, we have a significant
> marketing effort going on right now to try to capture many of these new
> enrollments particularly in places like Michigan and Texas and in Florida. But it
> would be wrong of me to try to project it, that we're going to accelerate
> enrollment growth on a basis of those things. I think it's going to allow us to stay
> on track from where we were.

Doc. Nos. 38 ¶ 171; 40-1 at 16–17.

The relied upon statement, "I think it's going to allow us to stay on track from where we

were," is a general and vague opinion, within a context that included cautionary language ("[I]t

would be wrong of me to try to project it, that we're going to accelerate enrollment growth on

the basis of those things."). There is no evidence from which it could be inferred that the

opinions expressed in these very general statements were not held by the speaker or that the

opinions relate to "matters of facts which can be verified by objective evidence."  *See Nolte v.*

*Capital One Fin. Corp.*, 390 F.3d 311, 315 (4th Cir. 2004) ("[A] statement of opinion may be a

false factual statement if the statement is false, disbelieved by its maker, and related to matters of

facts which can be verified by objective evidence.").  Certain facts were known at the time that

would support the opinions that K12 was "on track" to hit the projections stated in the August 29

call.  As mentioned above, K12 had received 25% more applications from July through

September of 2013 as compared to 2012, and had they been able to convert those applications

into enrollments, they would have been on target for their projections.

> 3. Now I want to provide with some insight regarding our intentions related to fiscal 2014 guidance. As was the case last year, we plan to issue full year guidance after reviewing fall enrollment data, likely the week of October 14. We also intend to update our guidance and measures to include enhanced guidance down to net income. I will also be providing quarterly guidance one quarter in advance as has been our practice this past year. And while we are not issuing guidance on the call today, we are comfortable with the fiscal 2014 estimates posted to First Call through yesterday as follows: revenue of $986.8 million; EBITDA of $133.5 million; EBIT of $62.8 million; net income of $36.2 million; and EPS of $0.95 a share. As you know, these estimates and our ability to achieve these figures are contingent on our final enrollment numbers, that which will not be available until October.

Doc. Nos. 38 ¶ 172; 40-1 at 17.

Plaintiff primarily relies on Rhyu's comment that he was "comfortable with" the FY14

projections on August 29, 2013.  *See* Doc. No. 38 ¶ 174.  However, Rhyu's statement is a

forward-looking opinion that includes significant cautionary language.  *See* Doc. No. 40-1 at 17

("As you know, these estimates and our ability to achieve these figures are contingent on our

final enrollment numbers, that which will not be available until October.").  This opinion is

essentially a forecast over a month before final enrollment numbers would become available and

is based on an assumption that K12 would be able to convert a sufficient number of the

applications it in fact received.  For these reasons, these statements fall within the safe harbor provision of the PSLRA as well.

With respect to scienter as to the relied upon statements in the 10-K and the August 29, 2013 conference call, plaintiff relies heavily on Packard's sales of K12 stock during the Class Period, beginning in July 2013.[9]  *See id.* ¶¶ 87–103, 133.  These sales, however, as a percentage of Packard's overall holdings, were not sufficiently large to allow the inferences that plaintiff draws; and the overall increase in Packard's K12 stock holdings, as measured after these sales, further undercuts such inferences.  Based on all the facts and circumstances alleged, the plaintiff has provided insufficient facts to infer that K12 or any of its officers, including Packard, had the required knowledge that K12 was not in a position to convert these applications it had received or to realize the financial forecasts that had been posted by analysts.

## Conclusion

Based on the facts alleged, the Court concludes that none of the relied upon Class Period statements are actionable. None of them contains false or misleading statements of historical fact or actionable opinions; and there are no facts that any defendant made any relied upon statement with the required scienter.  As it appears from the record, the defendants' statements occurred, at the latest, more than a month before the results of the 2013-2014 enrollment season would be

---

[9] Packard sold 192,000 K12 shares for $6.39 million, with profits of $3.28 million, between July 15 and October 2, 2013.  Doc. No. 38 ¶¶ 96–97 (chart); *id.* at 31–32. These sales constituted 19% of his total K12 stock holdings at the end of the Class Period, including exercisable stock options.  The sales were made on a regular basis (nearly weekly) pursuant to a non-discretionary Rule 10b5-1plan that was instituted on June 28, 2013.  With stock options, Packard's total K12 stock holdings over the Class Period increased, after his stock sales, by almost 20,000 shares.  *Id.* ¶¶ 89, 90, 98; Doc. No. 40-14.  Plaintiff relies heavily on the difference in Packard's stock sales during the Class Period (21 sales totaling 192,000 shares) and the eight month period preceding the Class Period (40,000 shares).  Defendants point out that over the 24 month period preceding the Class Period, Packard made 23 sales totaling 379,000 shares and during an eight month period in 2010, he sold 232,000 shares.

known. They also occurred at a time when K12 reasonably assumed it would receive sufficient enrollment applications, or in fact had obtained sufficient enrollment applications, to achieve the forecasted financial results. As defendants acknowledged afterwards, they were ill-prepared at the staffing level, despite an all-out effort to convert those applications into actual enrollments before the end of the enrollment season.

The impact on investors of defendants' lack of managerial competence cannot be minimized; and this case is a cautionary tale concerning the risks inherent in relying on corporate management's endorsements of analysts' forecasts, against which the securities laws, as they now exist in the PSLRA, provide limited protections.

For the above reasons, the Court finds and concludes as a matter of law that the Amended Complaint does not state a claim under the PSLRA as to any of the defendants.  Defendants' Motion to Dismiss will be granted and the action dismissed.

An appropriate Order will issue.


_____/s/_____
Anthony J. Trenga
United States District Judge


November 5, 2014
Alexandria, Virginia